RAFAEL BUSCAGLIA, TREASURER OF PUERTO RICO, Petitioner, *v.* TAX COURT OF PUERTO RICO, Respondent; RUDOLF F. FELS, Intervener.

No. 178. Argued May 3, 1948.—Decided June 11, 1948.

*Luis Negrón Fernández, Attorney General, Carlos Santana Becerra,* and *J. B. Fernández Badillo, Assistant Attorneys General,* for petitioner. *Jorge M. Morales* and *Mariano Canales* for intervener, complainant in the main action.

MR. CHIEF JUSTICE TRAVIESO delivered the opinion of the Court.

In the complaint filed in the Tax Court against the Treasurer of Puerto Rico, the complainant Rudolf F. Fels alleged, in brief, the following:

On March 7, 1946, the complainant purchased from the Government of the United States, in Puerto Rico, six motor trucks which formed part of the military equipment of the armed forces, "with the sole purpose of exporting them to the Dominican Republic immediately after they were purchased." The trucks were exported without being used or sold in this island.

The Treasurer of Puerto Rico levied upon and collected from the complainant an excise tax in the sum of $1,729.32, plus a fine of $50. On April 22, 1946, the complainant paid the sums claimed by the Treasurer and on May 8 of the same year he requested the refund thereof, which was denied on June 11, 1946.

The complainant alleges that the action of the Treasurer is illegal inasmuch as he has levied an export duty, in contravention of the provisions of the insular laws and of the Constitution of the United States.

The Treasurer in his answer denied the essential averments of the complaint and alleged "that his action is entirely legal and valid, since he has levied and collected a tax pursuant to subdivision 8, § 16 of the Internal Revenue Law of

Puerto Rico, as amended by Act No. 25 of December 4, 1942, a legal provision which is wholly valid and constitutional in its application to the instant case."

The Tax Court rendered a decision dismissing the complaint as to two of the trucks and sustaining it as to the remaining four. The Treasurer has applied to us for a review of said decision, and he urges that the respondent tribunal erred in holding (a) that the sale made to the complainant Fels constituted a step in the exportation of the four trucks; (b) that the excise tax collected from the plaintiff constituted an export duty, in violation of § 3 of the Organic Act; and (c) that the excise tax levied in this case is void and unconstitutional.

■■ For a better understanding of the question submitted to us for decision, it should be stated that the oral and documentary evidence introduced by the complainant, to which the respondent tribunal accorded credit, shows that the complainant purchased the four trucks with the sole purpose of immediately exporting them to Santo Domingo; that as soon as the four vehicles were delivered to him, the complainant sent them to the Exide Battery Service Co. of San Juan, in order that the latter should examine them, test them, and inform him whether they were in good condition; and that on March 18, 1946, the four vehicles, without having been used in Puerto Rico, were exported to Santo Domingo, consigned to José Biascoechea, plaintiff's agent in Ciudad Trujillo, to be used there in complainant's business of purchasing lumber for its exportation to Puerto Rico.

The enactment relied on by the Treasurer which is subdivision 8 of § 16 of the Internal Revenue Law of Puerto Rico, as amended by Act No. 25 of December 4, 1942, (Spec. Sess. Laws 1942) provides as follows:

"Section 16.—There shall be collected and paid once only, as an internal revenue tax on the following articles *sold, transferred, used or consumed in, or* introduced into Puerto Rico, . . . :

"8. On every autowagon, truck, tractor, and other similar self-propelling vehicles (by whatever name known), including chassis, etc., *sold, transferred, manufactured, or used in, or introduced into, Puerto Rico, a tax of twenty (20) per cent on the selling price in Puerto Rico.*" (Italics ours.)

The question for us to determine is whether, in view of the facts and circumstances of this case, the excise tax collected from the plaintiff constitutes an impost upon an export from Puerto Rico, and as such is prohibited by § 3 of our Organic Act, which provides that "no export duties shall be levied or collected on exports from Puerto Rico."

The last paragraph of § 3 of the Organic Act, in its pertinent part, provides:

"*And it is further provided,* That the internal-revenue taxes levied by the Legislature of Puerto Rico in pursuance of the authority granted by this Act on articles, goods, wares, or merchandise may be levied and collected as such legislature may direct, on the articles subject to said tax, as soon as the same are manufactured, *sold,* used, or brought into the Island; *Provided,* That no discrimination be made between the articles imported from the United States or foreign countries and similar articles produced or manufactured in Puerto Rico." (Italics ours.)

The following is a summary of the federal decisions on the subject:

In *Cornell* v. *Coyne,* 192 U.S. 418, the Commissioner of Internal Revenue collected from the plaintiff a tax of one cent per pound on more than 1½ million pounds of cheese, manufactured and exported by the plaintiff. The tax was levied pursuant to an Act of the Congress. The plaintiff claimed the return of the sums paid, alleging that the Act of Congress was repugnant to § 9, Article 1, of the Constitution of the United States, in that it failed to contain any provision whereby filled cheese manufactured for export trade and exported and sold in foreign markets, might be exported and sold free from the levy of any duty or tax thereon. The statute under which the tax was levied provided "that upon

all filled cheese which shall be manufactured there shall be assessed and collected a tax of one cent per pound, to be paid by the manufacturer thereof.''

In upholding the constitutional validity of the challenged statute, the Supreme Court said:

''. . . Subjecting filled cheese manufactured for the purpose of export to the same tax as all other filled cheese is casting no tax or duty on articles exported, but is only a tax or duty on the manufacturing of articles in order to prepare them for export. While that which is asked in this case is the return of a manufacturing tax there is nothing in the constitutional provision to distinguish between manufacturing and other taxes, and if the plaintiff's contention be sustained as to a manufacturing tax it would follow that the government was bound to refund all prior taxes imposed on articles exported. A farmer may raise cattle with the purpose of exportation, and in fact export them. Can it be that he is entitled to a return of all property taxes which have been cast upon those cattle? The true construction of the constitutional provision is that no burden by way of tax or duty can be cast upon the exportation of articles, and does not mean that articles exported are relieved from the prior ordinary burdens of taxation which rest upon all property similarly situated. The exemption attaches to the export and not to the article before its exportation. Such has been the ruling of this Court. In *Turpin* v. *Burgess,* 117 U.S. 504, 506, where the question was as to an export stamp tax on tobacco, Mr. Justice Bradley, speaking for the court, said:

'The constitutional prohibition against taxing exports is substantially the same when directed to the United States as when directed to a State. In the one case the words are, 'No tax or duty shall be laid on articles exported from any State.' Art. I, sec. 9, par. 5. In the other they are, 'No State shall, without the consent of Congress, lay any imposts or duties on imports or exports.' Art. I, sec. 10, par. 2. The prohibition in both cases has reference to the imposition of duties on goods by reason or because of their exportation or intended exportation, or whilst they are being exported. That would be laying a tax or duty on exports, or on articles exported, within the meaning of the Constitution. *But a general tax, laid on all property alike, and not levied on goods in course of exportation, nor because of their intended exportation, is not within the constitutional prohibition.*' '' (Italics ours.)

The facts involved in the case of *Spalding* v. *Edwards*, 262 U.S. 66, cited in support of the decision under review, are wholly different from those of the case at bar. An Act of the State of New York levied a tax "upon all . . . baseball bats, . . . balls of all kinds . . . sold by the manufacturer, producer, or importer." A Venezuelan firm ordered a commission merchant in New York, to buy for their account and risk a certain number of baseballs and baseball bats. The commissioner merchant instructed Spalding and Bros., the manufacturers, to deliver the packages, marked in the manner previously agreed, to the Atlantic and Caribbean Steam Navigation Company, to be transported to Venezuela and there delivered to the purchasers. In holding that the plaintiffs were entitled to recover the amount of the tax on the sale of the goods, the Supreme Court said:

". . . The question is whether the sale was a step in exportation, assuming as appears to be the fact, that the title passed at the moment when the goods were delivered into the carrier's hands.

"The fact that the law under which the tax was imposed was a general law touching all sales of the class, and not aimed specially at exports, would not help the defendant if in this case the tax was 'laid on articles exported from any State', because that is forbidden in terms by the Constitution. (Citing authorities.) Articles in course of transportation cannot be taxed. (Citing authorities.) So we return to the question that we have stated. To answer it with regard to any transaction we have to fix a point at which, in view of the purpose of the Constitution, the export must be said to begin. As elsewhere in the law there will be other points very near to it on the other side, so that if the necessity of fixing one definitely is not remembered any determination may seem arbitrary. In this case, for instance, while the goods were in process of manufacturing they were none the less subject to taxation if they were intended for export and made with specific reference to foreign wants. (Citing authorities.) On the other hand no one would doubt that they were exempt after they had been loaded upon the vessel for Venezuela and the bill of lading issued. It seems to us that the facts recited are closer to the latter than to the former side, and that the export had begun.

*"The very act that passed the title and that would have incurred the tax had the transaction been domestic, committed the goods to the carrier that was to take them across the sea,* for the purpose of export and with the direction to the foreign port upon the goods. The expected and accomplished effect of the act was to start them for that port. The fact that further acts were to be done before the goods would get to sea does not matter so long as they were only the regular steps to the contemplated result. Getting the bill of lading stands no differently from putting the goods on board ship. Neither does it matter that the title was in Scholtz & Co. and that theoretically they might change their mind and retain the bats and balls for their own use. . . . The overt act of delivering the goods to the carrier marks the point of distinction between this case and *Cornell v. Coyne,* 192 U.S. 418. To put it at any later point would fail to give to exports the liberal protection that hitherto they have received."* (Italics ours.)

In *Richfield Oil Corporation* v. *State Board,* 329 U.S. 69, decided November 25, 1946, the plaintiffs entered into a contract with the New Zealand Government for. the sale of oil, which was to be delivered, "to the order of the Naval Secretary, Navy Office, Wellington," into a tank steamer attached to the New Zealand Navy, in Los Angeles, California. Delivery was to be made f.o.b. Los Angeles, and payment effected in London. The oil was delivered and transported, no portion of it being used in the United States. The Collector of Customs did not levy any sales tax on the oil, but the defendant board—State Board of Equalization—assessed a retail sales tax, taking as a basis the gross receipts from the transaction. The Supreme Court of California upheld the constitutional validity of the tax levied and denied the refund sought. The Federal Supreme Court reversed that judgment, saying:

"The Supreme Court of California held that this provision did not bar the tax because the delivery of the oil which resulted in the passage of title occurred prior to the commencement of the exportation. The court suggested, and the appellee concedes, that a different result might follow if the oil had been delivered to a common carrier;

'for then it would have been placed in the hands of an instrumentality whose *sole purpose* is to export goods, thus indelibly characterizing the process as a part of exportation.' . . .

"It seems clear that we cannot write any such qualifications into the Import-Export Clause. It prohibits every State from laying 'any' tax on imports or exports without the consent of Congress. Only one exception is created—'except what may be absolutely necessary for executing its inspection Laws.' The fact of a single exception suggests that no other qualification of the absolute prohibition was intended. . . .

"    .         .         .         .         .         .         .         .

"The questions remain whether we have here an export within the meaning of the constitutional provision and, if so, whether this tax was a prohibited impost upon it. . . . The question whether at the time the tax accrued the oil was an export presents a different problem.

"    .         .         .         .         .         .         .         .

"The certainty that the goods are headed to sea and that the process of exportation has started may normally be best evidenced by the fact that they have been delivered to a common carrier for that purpose. But the same degree of certainty may exist though no common carrier is involved. The present case is an excellent illustration. The foreign purchaser furnished the ship to carry the oil abroad. Delivery was made into the hold of the vessel from the vendor's tanks located at the dock. *That delivery marked the commencement of the movement of the oil abroad.* It is true, as the Supreme Court of California observed, that at the time of the delivery the vessel was in California waters and was not bound for its destination until it started to move from the port. But when the oil was pumped into the hold of the vessel, it passed into the control of a foreign purchaser and there was nothing equivocal in the transaction which created even a probability that the oil would be diverted to domestic use. It would not be clearer that the oil had started upon its export journey had it been delivered to a common carrier at an inland point. The means of shipment are unimportant so long as the certainty of the foreign destination is plain. (Italics ours.)

In decisions prior to the one lastly cited, the Federal Supreme Court sustained a tax levied by the State of Louisiana on coal held in that State for sale, even when the coal was afterward sold for exportation, because "where a general

tax is laid on all property alike, it can not be construed as a duty on exports when falling upon goods not then intended for exportation, though they should happen to be exported afterward." *Brown* v. *Houston,* 114 U.S. 622. In *Coe* v. *Errol,* 116 U.S. 517, where there were involved logs, cut in New Hampshire and held on a river there for transportation to Maine, the Supreme Court laid down the rule—acknowledged as correct in *Richfield Oil Corporation* v. *State Board, supra*—that "goods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey." In *Turpin* v. *Burgess,* 117 U.S. 504 a federal excise tax on manufactured tobacco, laid upon the goods before they left the factory, was sustained on the ground that "they were not in course of exportation; they might never be exported; whether they would be or not would depend altogether on the will of the manufacturer."

If we apply to the facts of the case at bar the doctrine established by the Federal Supreme Court, we must reach the conclusion—unavoidable, in our opinion—that the tax levied on and collected from the intervener herein is not an export tax.

Subdivision 8 of § 16 *supra,* is a general law which equally affects every transaction involving the sale, transfer, manufacture, use, or introduction into Puerto Rico of autowagons, trucks, tractors, and other similar self-propelling vehicles. The taxable event in the instant case was the sale of four trucks made by the Government of the United States to the intervener Fels, a sale which was completed in Puerto Rico, through the payment of the price and the delivery of the vehicles to the purchaser on March 7, 1946, 11 days before the trucks were delivered to the steamer which was to transport them to the Dominican Republic.

Subdivision (*f*) of § 39 of the Internal Revenue Law, as amended by Act No. 78, approved May 7, 1945, provides:

"(*f*) When the taxes on taxable articles have not been paid at the time of their introduction because they have been introduced by an entity exempt from the payment of excises, or for any other reason, and the introducer sells, conveys, or otherwise alienates said articles to a person not exempt from the payment of excises, the taxes shall be paid by the acquirer, assignee, or usufructuary, within a period of fifteen (15) days from the date of the sale, conveyance, or other form of alienation."

The motor trucks in this case were introduced by the Government of the United States, which was exempt from the payment of the excise tax levied by subdivision 8 of § 16, *supra.* On March 7, 1946, when the importing government sold the trucks to the intervener, the latter, not being exempt from the payment of excises, was forthwith bound, *as the purchaser of the vehicles, to pay a tax of 20 per cent* on the selling price in Puerto Rico, and he was required to effect such payment within the period granted to him by the statute, that is, within 15 days following the sale.

Here we cannot say, as it was said in *Spalding & Bros.* v. *Edwards, supra,* that "the very act that passed the title and that would have incurred the tax had the transaction been domestic, committed the goods to the carrier that was to take them across the sea." The sale made on March 7, 1946, was a domestic transaction, completed and carried out in Puerto Rico, whereby the title to the trucks passed to the purchaser 11 days before the vehicles were delivered to the steamer, the step with which the exportation process was started. The fact that the payment of the tax was not made until after the vehicles were shipped does not affect the legal question under discussion, for the obligation to pay the tax fell on the intervener on the date of the completion of the sale, which is the taxable event. On that date—March 7, 1946—the trucks were not yet in course of exportation. Whether or not they were to be exported wholly depended on

the will of the intervener. That such was the situation is shown by the following paragraph which we copied from the opinion delivered by the respondent tribunal:

"R. F. Fels, is a merchant, and in the course of his cross-examination he stated that, *if any person in this island had offered him for the trucks,* not used in his business, *an amount in excess of the above-mentioned price of $2,300, he would have sold the vehicles here,* relying, of course, on the fact that he could always purchase other units from the aforesaid *Office of Surplus Property,* in order to fulfill, in any event, the obligation which he had contracted of sending to Santo Domingo those which he had already sold to the purchasers above referred to." (Italics ours.)

It may be seen, therefore, that the intervener acquired the trucks with a dual purpose—to re-sell them in Puerto Rico if he could obtain a higher price than the one he had paid, or to export them to Santo Domingo in the event it were not possible for him to obtain a profit.

The decision under review will be reversed.

Mr. Justice De Jesús did not participate herein.