RAFAEL BUSCAGLIA, TESORERO DE PUERTO RICO, peticionario, *v.* TRIBUNAL DE CONTRIBUCIONES DE PUERTO RICO, demandado; RUDOLF F. FELS, interventor.

Núm. 178.—*Sometido:* Mayo 3, 1948. *Resuelto:* Junio 11, 1948.

*Hon. Procurador General Luis Negrón Fernández y Carlos Santana Becerra y J. B. Fernández Badillo, Procuradores Generales Auxiliares,* abogados del peticionario; *Jorge M. Morales y Mariano Canales,* abogados del interventor, querellante en el pleito principal.

EL JUEZ PRESIDENTE SEÑOR TRAVIESO emitió la opinión del tribunal.

En la demanda radicada ante el Tribunal de Contribuciones contra el Tesorero de Puerto Rico, el demandante Rudolf F. Fels alegó, en síntesis, lo siguiente:

El 7 de marzo de 1946 el demandante compró al Gobierno de los Estados Unidos, en Puerto Rico, seis autocamiones que formaban parte del equipo militar de las fuerzas armadas, "con el único propósito de exportarlos inmediatamente después de adquiridos a la República Dominicana." Los camiones fueron exportados sin que fueran usados o vendidos en esta Isla.

El Tesorero de Puerto Rico impuso y cobró al demandante arbitrios por la suma de $1,729.32, más $50 de multa. El demandante pagó las sumas reclamadas por el Tesorero el día 22 de abril de 1946 y en mayo 8 del mismo año solicitó el reintegro, el que le fué denegado en junio 11 de 1946.

Alega el demandante que las actuaciones del Tesorero son ilegales por haber impuesto una contribución sobre exportaciones, en contravención de lo dispuesto por las leyes insulares y por la Constitución de los Estados Unidos.

Contestó el Tesorero negando los hechos esenciales de la demanda y alegó "que su actuación es completamente legal

y válida, habiendo impuesto y cobrado una contribución de acuerdo con el inciso 8 de la sección 16 de las Leyes de Rentas Internas de Puerto Rico, según fué enmendado por la Ley núm. 25 de 4 de diciembre de 1942 ((2) pág. 127), disposición legal que es completamente válida y constitucional en su aplicación al presente caso.''

El Tribunal de Contribuciones dictó su resolución declarando sin lugar la querella en cuanto a dos de los camiones y con lugar en cuanto a los cuatro restantes. El Tesorero ha solicitado la revisión de dicha resolución, alegando que el Tribunal inferior erró al resolver (a) que la venta hecha al demandante Fels constituyó un paso en el proceso de exportación de los cuatro camiones; (b) que los arbitrios cobrados al demandante constituyeron un impuesto sobre exportación en violación del artículo 3 de la Carta Orgánica; y (c) que los arbitrios impuestos en este caso son nulos e inconstitucionales.

██ Para la mejor comprensión de la cuestión sometida a nuestra decisión conviene hacer constar que de la prueba testifical y documental presentada por el demandante y creída por el Tribunal inferior, resulta que el demandante compró los cuatro camiones con el único propósito de exportarlos inmediatamente para Santo Domingo; que tan pronto como los cuatro vehículos le fueron entregados, el demandante los envió a la Exide Battery Service Co., en San Juan, para que los examinara, los probara y le informara si se hallaban en buenas condiciones; y que el 18 de marzo de 1946, sin que se hubiesen utilizado en Puerto Rico, los cuatro vehículos fueron exportados a Santo Domingo, consignados a José Biascoechea, agente del demandante en Ciudad Trujillo, para ser utilizados en el negocio que el demandante tenía allí establecido de compra de maderas para su exportación a Puerto Rico.

El estatuto invocado por el Tesorero, apartado 8 del artículo 16 de la Ley de Rentas Internas de Puerto Rico, en-

mendado por la Ley núm. 25 de diciembre 4 de 1942, dispone:

· "*Sección 16.*—Se cobrará y pagará como impuesto de rentas internas, por una sola vez, sobre todos los artículos siguientes y aquéllos comprendidos en esta sección de la ley, que fueren *vendidos, traspasados, usados, consumidos o introducidos en Puerto Rico:*

"8. Sobre autovagones, camiones, y autos de arrastre y otros vehículos similares de autoimpulsión (sea cual fuere el nombre con que se conocieren), incluyendo chassis, etc., *que se vendan, traspasen, fabriquen, usen o introduzcan en Puerto Rico, un impuesto de veinte (20) por ciento sobre el precio de venta en Puerto Rico.*" (Bastardillas nuestras.)

La cuestión que nos toca resolver es si dados los hechos y circunstancias de este caso los arbitrios cobrados al demandante constituyen una contribución sobre una exportación procedente de Puerto Rico y, como tal, prohibida por el artículo 3 de nuestra Carta Orgánica, el que dispone que "no se impondrá ni cobrará derecho alguno sobre las exportaciones procedentes de Puerto Rico."

El último párrafo del artículo 3 de la Carta Orgánica, en lo que es pertinente, dice así:

"*Disponiéndose, además,* que las contribuciones de rentas internas que de acuerdo con la facultad concedida por esta ley imponga la Asamblea Legislativa de Puerto Rico, sobre cualesquiera artículos, efectos, mercaderías o mercancías, podrá ser impuesta y cobrada sobre los artículos sujetos a dicha contribución, según determine la referida Asamblea Legislativa, tan pronto como los mismos hayan sido fabricados, *vendidos,* usados o importados en la Isla; *Disponiéndose,* que no se hará distinción alguna entre los artículos importados de los Estados Unidos o de países extranjeros y los artículos similares producidos o manufacturados en Puerto Rico." (Bastardillas nuestras.)

He aquí un resumen de la jurisprudencia federal sobre la materia:

En *Cornell* v. *Coyne,* 192 U.S. 418, el Comisionado de Rentas Internas cobró al demandante una contribución de un centavo por libra sobre más de millón y medio de libras de queso fabricado y exportado por el demandante. La con-

tribución fué impuesta de acuerdo con una ley del Congreso Federal. El demandante reclamó el reintegro de las sumas pagadas, alegando que la ley del Congreso estaba en pugna con la Sección 9, Artículo 1 de la Constitución de los Estados Unidos, porque no contenía disposición alguna al efecto de permitir que el queso manufacturado para el negocio de exportación y exportado y .vendido en mercados extranjeros, pudiese ser exportado y vendido libre de toda imposición de derechos o contribuciones. El estatuto bajo el cual se impuso la contribución disponía ''Que sobre todo queso (*filled cheese*) que sea fabricado se impondrá y cobrará una contribución de un centavo por libra, la que será pagada por el fabricante del mismo.''

Al sostener la validez constitucional del estatuto impugnado, la Corte Suprema se expresó así:

''Someter el queso manufacturado para ser exportado a la misma contribución impuesta a todos los demás quesos, no es imponer una contribución o derecho sobre artículos exportados, sino que es solamente una contribución o derecho sobre la manufactura de artículos con el fin de prepararlos para la exportación. Mientras que lo que aquí se pide es la devolución de una contribución sobre manufacturas, no hay nada en la disposición constitucional para distinguir entre ésa y otra clase de contribuciones, y si la contención del demandante fuese sostenida en cuanto a una contribución sobre la manufactura, la consecuencia sería que el gobierno estaría obligado a devolver todas las contribuciones impuestas con anterioridad sobre artículos exportados. Un agricultor puede criar ganado con el propósito de exportarlo, y como cuestión de hecho exportarlo. ¿Es acaso posible que él tenga derecho al reintegro de todas las contribuciones sobre la propiedad impuestas sobre ese ganado? La verdadera interpretación de la disposición constitucional es que el peso de una contribución o derecho no se puede hacer recaer sobre la exportación de artículos, y no significa que artículos exportados están exentos del peso ordinario de contribuciones anteriores que gravitan sobre todas las propiedades igualmente situadas. La exención va unida a la exportación y no al artículo antes de su exportación. Tal ha sido la decisión de esta Corte. En *Turpin* v. *Burgess,* 117 U.S. 504, 506, en donde la cuestión era ·sobre una contribución de exportación sobre el tabaco, el Sr. Juez Bradley, hablando a nombre de la Corte, dijo:

" 'La prohibición constitucional contra la imposición de contribuciones sobre las exportaciones es substancialmente la misma cuando va dirigida a los Estados Unidos como cuando va dirigida a un Estado. En un caso las palabras son, "No se impondrán contribuciones o derechos sobre artículos exportados de cualquier Estado." Art. 1, Sec. 9, párr. 5. En el otro son, "Ningún Estado impondrá, sin el consentimiento del Congreso, contribuciones o derechos sobre importaciones o exportaciones." Art. 1, Sec. 10, párr. 2. La prohibición en ambos casos se refiere a la imposición de derechos sobre artículos por razón de o en relación con su exportación o proyectada exportación, o mientras están en el proceso de exportación. Eso sería imponer una contribución o derecho sobre exportaciones, o sobre artículos exportados, dentro del significado de la Constitución. *Pero una contribución general, impuesta por igual a todas las propiedades, y no impuesta sobre artículos en proceso de exportación, ni por razón de su proyectada exportación, no está dentro de la prohibición constitucional.*' " (Bastardillas nuestras.)

En el caso de *Spalding & Bros.* v. *Edwards,* 262 U.S. 66, citado en apoyo de la resolución recurrida, los hechos del mismo son enteramente diferentes a los del caso de autos. Un estatuto del estado de Nueva York imponía una contribución "Sobre todos los . . . bates de *baseball* . . . bolas de todas clases . . . vendidos por el fabricante, productor, o importador." Una casa de Venezuela ordenó a un comisionista en Nueva York, que comprase por cuenta y riesgo de dicha casa un número de bolas y bates de baseball. El comisionista dió instrucciones a Spalding & Bros., los fabricantes, para que entregasen los paquetes, marcados en la forma previamente convenida, a la Atlantic & Caribbean Steam Navigation Company, para ser transportados a Venezuela y entregados allí a los compradores. Al resolver que los demandantes tenían derecho a la devolución del importe de la contribución sobre la venta de los artículos, la Corte Suprema se expresó así:

"La cuestión es si la venta constituyó un paso en la exportación, asumiendo, según parece ser el hecho, que el título se transmitió en el momento en que los artículos fueron entregados al porteador. El

hecho .de que la ley por virtud de la cual se impuso la contribución era una ley general que afectaba a todas las ventas de la misma clase, y no dirigida especialmente a las exportaciones, no ayudaría al demandado si en este caso la contribución 'fué impuesta sobre artículos exportados en algún Estado', porque eso está prohibido expresamente por la Constitución. (Citas.) A los artículos en el curso de transportación no se les puede imponer contribución. (Cita.) Así volvemos a la cuestión que hemos expuesto. Para contestarla con respecto a una transacción cualquiera tenemos que fijar un punto en el que, en vista del propósito de la Constitución, debe decirse que la exportación comenzó. Como ocurre con otras leyes, habrá otros puntos, muy cercanos, del otro lado, de manera que si la necesidad de fijar un punto definitivamente no es recordada, cualquiera determinación puede parecer arbitraria. En este caso, por ejemplo, mientras los artículos estaban en el proceso de fabricación no dejaban de estar sujetos a contribución si se intentaba exportarlos y se fabricaban con referencia específica a necesidades extranjeras. (Citas.) Por otro lado nadie dudaría de que estaban exentos después que habían sido cargados en el barco para Venezuela y se había expedido un conocimiento. Nos parece que los hechos expuestos están más cerca del último lado que del primero, y que la exportación había comenzado.

*El mismo acto que trasmitió el título y que hubiese causado la contribución si la transacción hubiese sido 'doméstica, entregó los artículos al porteador que había de llevarlos al otro lado de los mares,* con el propósito de exportarlos y con la dirección del puerto extranjero sobre los artículos. El efecto esperado y realizado del acto fué el poner los artículos en movimiento hacia ese puerto. El hecho de que algunos otros actos debieran ser realizados antes de que los artículos llegasen al mar no tiene importancia, siempre que se trate solamente de los pasos regulares para llegar al resultado que se intentaba. Obtener el conocimiento no difiere del acto de colocar los artículos a bordo del barco. Tampoco importa que el título estuviese en Scholtz & Co. y que teóricamente ellos hubieran podido cambiar de idea y retener los bates y bolas para su propio uso. .. . . El acto positivo de entregar los artículos al porteador marca el punto de distinción entre este caso y *Cornell* v. *Coyne,* 192 U.S. 418. Colocarlo en cualquier otro punto más remoto dejaría de dar a las exportaciones la protección liberal que hasta ahora han recibido.''

En *Richfield Oil Corporation* v. *State Board,* 328 U.S. 69, decidido en noviembre 25, 1946, la demandante celebró

un contrato con el Gobierno de Nueva Zelandia para la venta de aceite, el cual debía ser entregado "a la orden del Secretario Naval, Oficina de la Marina, Wellington", en un barco tanque de la marina de Nueva Zelandia, en Los Angeles, California. La entrega debía hacerse f.o.b. Los Angeles y el precio pagarse en Londres. El aceite fué entregado y transportado, sin que parte alguna del mismo fuese usada en los Estados Unidos. El Colector de Aduana no impuso contribución sobre la venta del aceite, pero la Junta demandada —State Board of Equalization—impuso una contribución sobre ventas al por menor, tomando como base los ingresos brutos de la transacción. La Corte Suprema de California sostuvo la validez constitucional de la imposición y denegó el reintegro solicitado. La sentencia fué revocada por la Corte Suprema Federal, expresándose así:

"La Corte Suprema de California sostuvo que esta disposición no impedía la contribución porque la entrega del aceite, por virtud de la cual se transfirió el título, ocurrió con anterioridad al comienzo de la exportación. La corte sugirió, y el apelado así lo admite, que el resultado podría ser diferente si el aceite hubiese sido entregado a un porteador público; 'porque entonces hubiese sido colocado en las manos de una instrumentalidad cuyo único propósito es la exportación de artículos, caracterizando así el proceso, indeleblemente, como una parte de la exportación.' . . .

"Parece claro que no podemos añadir tales limitaciones a la Cláusula sobre Importaciones y Exportaciones. Ella prohibe a cada uno de los Estados el imponer cualquier contribución sobre importaciones o exportaciones sin el consentimiento del Congreso. Se crea una sola excepción—'excepto la que pueda ser absolutamente necesaria para la ejecución de sus leyes de inspección.' El hecho de una sola excepción sugiere que no se pensó en ninguna otra limitación de la prohibición absoluta.

"\* \* \* \* \* \* \*

"Quedan las cuestiones sobre si tenemos aquí una exportación dentro del significado de la disposición constitucional y, en caso afirmativo, si esta contribución era un impuesto prohibido. . . . La cuestión sobre si en la fecha en que se impuso la contribución el aceite era una exportación, presenta un problema diferente.

"\* \* \* \* \* \* \*

"La certeza de que los artículos van en dirección hacia el mar y que el proceso de exportación ha comenzado puede normalmente probarse mejor por el hecho de que los mismos han sido entregados a un porteador público con ese propósito. Pero el mismo grado de certeza puede existir aun cuando no esté envuelto ningún porteador público. El presente caso es un ejemplo excelente. El comprador extranjero suministró el barco para llevar el aceite a su destino. La entrega fué hecha en la bodega del barco, desde los tanques del vendedor situados en el muelle. *Esa entrega fijó el comienzo del movimiento del aceite hacia el exterior.* Es cierto, como observó la Corte Suprema de California, que en la fecha de la entrega el barco se encontraba en aguas de California y no se dirigía hacia su destino hasta que comenzó a salir del puerto. Pero cuando el aceite fué bombeado a la bodega del barco, el mismo quedó bajo el control de un comprador extranjero y no hubo en la transacción nada equívoco que pudiera crear siquiera una probabilidad de que el aceite pudiese ser desviado para uso doméstico. No sería más claro que el aceite había comenzado su viaje de exportación, si el mismo hubiese sido entregado a un porteador público en un punto en el interior. Los medios de embarque carecen de importancia, siempre que la certeza de su destino hacia el extranjero sea clara."

En decisiones anteriores a la últimamente citada, la Corte Suprema Federal sostuvo como válida una contribución impuesta por el Estado de Louisiana sobre carbón depositado en dicho estado para la venta, aun cuando el carbón fué posteriormente vendido para ser exportado, porque "cuando se impone una contribución general sobre todas las propiedades por igual, no puede ser interpretada como un derecho sobre exportaciones cuando recae sobre artículos que en esa fecha no se intentaba exportar, aun cuando los mismos hayan sido exportados con posterioridad." *Brown* v. *Houston,* 114 U.S. 622. En *Coe* v. *Errol,* 116 U.S. 517, en que se trataba de troncos de árboles, cortados en New Hampshire y depositados allí en el río para ser transportados a Maine, la Corte Suprema sentó el principio—reconocido como correcto en *Richfield Oil Corp.* v. *State Board,* supra— que "los artículos no dejan de formar parte de la masa general de propiedad en el Estado, sujetos, como tales, a su

jurisdicción, y a tributación en la forma usual, hasta que hayan sido embarcados, o entregados a un porteador público para ser transportados a otro Estado, o hayan comenzado a ser transportados en una ruta o viaje continuos." En *Turpin* v. *Burgess*, 117 U.S. 504, se sostuvo la validez de un arbitrio sobre tabaco manufacturado, impuesto antes de que los artículos saliesen de la factoría, por el fundamento de que "ellos no estaban en el proceso de exportación; podrían nunca ser exportados; si habrían de ser o no exportados dependía por completo de la voluntad del fabricante."

Si aplicamos a los hechos del caso de autos la doctrina establecida por la Corte Suprema Federal, tenemos que llegar a la conclusión, a nuestro juicio inescapable, de que la contribución impuesta y cobrada al aquí interventor no es una contribución sobre exportación.

El artículo 16, apartado 8 de la Ley de Rentas Internas, supra, es una ley general, que afecta por igual a toda transacción que envuelva la venta, traspaso, fabricación, uso o introducción en Puerto Rico de autovagones, camiones y autos de arrastre y otros vehículos similares de autoimpulsión. El incidente tributable (*taxable event*) en el presente caso fué la venta de cuatro camiones, hecha por el Gobierno de los Estados Unidos al interventor Fels, venta que fué consumada en Puerto Rico, mediante el pago del precio y la entrega de los vehículos al comprador el 7 de marzo de 1946, once días antes de la fecha en que los camiones fueron entregados al barco que había de transportarlos a la República Dominicana.

La sección 39, apartado "*f*" de la Ley de Rentas Internas, según fué enmendada por la Ley núm. 78, aprobada el 7 de mayo de 1945, dispone:

"(*f*) Cuando los impuestos sobre artículos tributables no hayan sido pagados a la introducción, por haber sido introducidos por una entidad exenta del pago de arbitrios, o por cualquier otro motivo,

y el introductor los vendiere, traspasare o en otra forma enajenare los mismos a una persona no exenta del pago de arbitrios, los impuestos se pagarán por el adquirente, cesionario o usufructuario dentro de un período de quince (15) días a partir del día de la venta, traspaso u otra forma de enajenación.''

Los autocamiones en este caso fueron introducidos por el Gobierno de los Estados Unidos, el cual estaba exento del pago de los arbitrios impuestos por la sección 16, apartado 8, supra. Cuando el gobierno introductor vendió los camiones, en marzo 7 de 1946, al interventor, éste, no estando exento del pago de arbitrios, quedó obligado desde ese momento, *como adquirente de los vehículos, a pagar el impuesto de 20 por ciento* sobre el precio de venta en Puerto Rico, debiendo efectuar el pago dentro del plazo concedídole por el estatuto, o sea dentro de los quince días siguientes al de la venta.

Aquí no podemos decir como se dijo en *Spalding & Bros.* v. *Edwards,* supra, que ''el mismo acto que trasmitió el título y que hubiese causado la contribución si la transacción hubiese sido doméstica, entregó los artículos al porteador que había de llevarlos al otro lado de los mares.'' La venta efectuada en marzo 7 de 1946 fué una transacción doméstica, perfeccionada y consumada en Puerto Rico, mediante la cual el título sobre los camiones fué trasmitido al comprador once días antes de que los vehículos fuesen entregados al barco, acto con el cual comenzó el proceso de exportación. El hecho de que el pago de los arbitrios no se verificase hasta una fecha posterior a la del embarque de los vehículos en nada afecta la cuestión legal que estamos considerando, toda vez que la obligación de pagar el arbitrio, recayó sobre el interventor en la fecha de la consumación de la venta, que es el incidente tributable. En esa fecha— marzo 7, 1946—los camiones no se encontraban aún en proceso de exportación. Si habrían de ser o no exportados dependía por completo de la voluntad del interventor. Que

ésa era la situación lo demuestra el siguiente párrafo, que copiamos de la opinión emitida por el Tribunal recurrido:

"R. F. Fels es comerciante, y en el curso de las repreguntas que se le hicieron manifestó que, *si alguna persona en este país le hubiese ofrecido por los camiones,* no usados en su negocio, *una cantidad en exceso del referido precio de $2,300, él hubiera vendido los vehículos aquí,* contando, desde luego, con que siempre podría comprar otras unidades de la repetida *Office of Surplus Property,* para cumplir, de todos modos, su compromiso contraído de enviar a Santo Domingo los que ya había vendido a los compradores anteriormente mencionados." (Bastardillas nuestras.)

Se ve, pues, que el interventor adquirió los camiones con un doble propósito—revenderlos en Puerto Rico, si conseguía un precio mayor que el que él había pagado, o exportarlos a Santo Domingo en caso de que no le fuera posible realizar una ganancia.

*La resolución recurrida será revocada.*

El Juez Asociado Sr. De Jesús no intervino.