192 U.S. 418 (1904)
CORNELL
v.
COYNE.
No. 113.
Supreme Court of United States.
Argued January 18, 19, 1904.
Decided February 23, 1904.
ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.
*420 Mr. William E. Mason and Mr. Charles W. Greenfield, with whom Mr. Lewis F. Mason and Mr. Charles E. Kremer were on the brief, for plaintiffs in error.
Mr. Assistant Attorney General McReynolds for defendant in error.
*426 MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.
The contention is that inasmuch as this filled cheese was manufactured under contract for export, and was in fact exported, the tax of one cent per pound prescribed by section 9 was prohibited by the fifth paragraph of section 9, article I, of the Constitution, which reads: "No tax or duty shall be laid on articles exported from any State."
But this means that no burden shall be placed on exportation, and does not require that any bounty be given therefor. Congress has power to encourage exportation by remitting taxes on goods manufactured at home as it has power to encourage manufactures by duties on imports, yet the Constitution does not compel it to do either the one or the other. This power of encouraging is illustrated by section 11 of this act, which requires all imported filled cheese to pay, in addition to import duties, an internal revenue tax of eight cents a pound  eight times as much as that manufactured at home. To remit on articles exported the tax which is cast upon other like articles consumed at home, while perhaps not technically a bounty on exportation, has some of the elements thereof. By this act all filled cheese is subject to a manufacturing tax of one cent a pound. To remit that tax in favor of filled cheese exported may encourage the manufacturer to seek a foreign rather than *427 a home market, but if the full tax on all filled cheese manufactured is required for the support of the government the remission of part necessitates revenue from some other source. Doubtless the remission is given in hope of widening the market and increasing the production, but that is only a possibility of the future, while the loss in the revenue is a fact of the present. Subjecting filled cheese manufactured for the purpose of export to the same tax as all other filled cheese is casting no tax or duty on articles exported, but is only a tax or duty on the manufacturing of articles in order to prepare them for export. While that which is asked in this case is the return of a manufacturing tax there is nothing in the constitutional provision to distinguish between manufacturing and other taxes, and if the plaintiff's contention be sustained as to a manufacturing tax it would follow that the government was bound to refund all prior taxes imposed on articles exported. A farmer may raise cattle with the purpose of exportation, and in fact export them. Can it be that he is entitled to a return of all property taxes which have been cast upon those cattle? The true construction of the constitutional provision is that no burden by way of tax or duty can be cast upon the exportation of articles, and does not mean that articles exported are relieved from the prior ordinary burdens of taxation which rest upon all property similarly situated. The exemption attaches to the export and not to the article before its exportation. Such has been the ruling of this court. In Turpin v. Burgess, 117 U.S. 504, 506, where the question was as to an export stamp tax on tobacco, Mr. Justice Bradley, speaking for the court, said:
"The constitutional prohibition against taxing exports is substantially the same when directed to the United States as when directed to a State. In the one case the words are, `No tax or duty shall be laid on articles exported from any State.' Art. I, sec. 9, par. 5. In the other they are, `No State shall, without the consent of Congress, lay any imposts or duties on imports or exports.' Art. I, sec. 10, par. 2. The prohibition *428 in both cases has reference to the imposition of duties on goods by reason or because of their exportation or intended exportation, or whilst they are being exported. That would be laying a tax or duty on exports, or on articles exported, within the meaning of the Constitution. But a general tax, laid on all property alike, and not levied on goods in course of exportation, nor because of their intended exportation, is not within the constitutional prohibition."
See also Brown v. Houston, 114 U.S. 622; Coe v. Errol, 116 U.S. 517.
Justice Miller, in his lectures on the Constitution (p. 592) says:
"The Congress of the United States, during the late civil war, imposed a tax upon cotton and tobacco, which tax was not limited to those products when in the process of transportation, but was assessed on all the cotton and tobacco in the country. It was argued that because the larger part of these products was exported out of the country and sold to foreign nations, and because their production was limited to a particular part of the country, the tax was forbidden by the corresponding clause of the Constitution prohibiting Congress from levying a tax on exports. Although the question came at that time to the Supreme Court of the United States, it was not then decided, because of a division of opinion in that court. The recent cases, however, of Coe v. Errol, 116 U.S. 517, and Turpin v. Burgess, 117 U.S. 504, seem to decide that the objection was not valid, and hold that only such property as is in the actual process of exportation, and which has begun its voyage or its preparation for the voyage, can be said to be an export."
Some light is thrown on this question by the cases of Kidd v. Pearson, 128 U.S. 1, and United States v. E.C. Knight Company, 156 U.S. 1. In the former a manufacturer of intoxicating liquors in Iowa claimed to be beyond the reach of the prohibitory law of the State on the ground that he manufactured only for exportation, and therefore as Congress had *429 exclusive control over interstate commerce it had like control over the manufacture for interstate commerce. But this court, in an elaborate opinion by Mr. Justice Lamar, unanimously held against the contention, and decided that commerce did not commence until manufacture was finished, and that therefore the State was not prevented from exercising exclusive control over the manufacture. In the latter case the question was whether a monopoly of the business of manufacturing sugar within a State was a restraint of interstate commerce, and therefore within the purview of the act of Congress to protect trade and commerce against unlawful restraints and monopolies, 26 Stat. 209, and it was held that it did not, Chief Justice Fuller announcing the opinion of the court, saying (pp. 12 and 13):
"Commerce succeeds to manufacture, and is not a part of it. .. . The fact that an article is manufactured for export to another State does not of itself make it an article of interstate commerce, and the intent of the manufacturer does not determine the time when the article or product passes from the control of the State and belongs to commerce."
There is nothing in the case of Fairbank v. United States, 181 U.S. 283, inconsistent with these views. There the question was as to the validity of a stamp tax on a foreign bill of lading, and it was held that it was a tax directly on the exportation. As said in the opinion with reference to the constitutional provision (p. 292): "The purpose of the restriction is that exportation, all exportation, shall be free from national burden." It is unnecessary to refer to the earlier legislation of Congress which, as shown by counsel for the government in his brief, has been in harmony with this construction. From what we have said it is clear that there is no constitutional objection to the imposition of the same manufacturing tax on filled cheese manufactured for export and, in fact, exported, as upon other filled cheese.
Although the only charge in the declaration and the only matter complained of in the assignments of error is the unconstitutionality *430 of the act, and especially of section 9 thereof, in failing to contain provisions for the exportation of filled cheese free from the levy of any tax or duty, counsel have in this court made a further contention that if the act be constitutional, it is because, properly construed, it does provide for exportation free from tax or duty. The argument is that the title of the act names as one of its purposes to regulate "exportation;" that while in the act there is no express provision for exportation, section 9, in reciting that "the provisions of existing laws governing the engraving, issue, sale, accountability, effacement and destruction of stamps relating to tobacco and snuff, as far as applicable, are hereby made to apply to stamps provided for by this section," is to be construed as incorporating all provisions respecting stamps "relating to tobacco and snuff," including those for stamps on exports, which are issued free of charge.
Assuming, without deciding, that we may rightfully reverse the judgment of the Circuit Court for a failure to consider a question which was not presented, and that we may treat the declaration as amended so as to present this question, we are of opinion that the contention as to the construction of the act cannot be sustained. The title of an act is referred to only in cases of doubt or ambiguity.
"The title is no part of an act and cannot enlarge or confer powers, or control the words of the act unless they are doubtful or ambiguous. United States v. Fisher, 2 Cranch, 358, 386; Yazoo & Mississippi Railroad v. Thomas, 132 U.S. 174, 188. The ambiguity must be in the context and not in the title to render the latter of any avail." United States v. Oregon &c. Railroad, 164 U.S. 526, 541. See also Price v. Forrest, 173 U.S. 410, 427, and cases cited.
There is no doubt or ambiguity in the act. Section 9 explicitly declares "that upon all filled cheese which shall be manufactured there shall be assessed and collected a tax of one cent per pound, to be paid by the manufacturer thereof." And while the section contains a reference to existing laws *431 governing the engraving, issue, etc., of stamps relating to tobacco and snuff, that clause is a part of the sentence which provides that the tax levied by this section shall be represented by coupon stamps, and the existing laws governing the engraving, issue, etc., of stamps are in terms "hereby made to apply to stamps provided for by this section" as far as applicable. In other words, the provisions of existing laws concerning the engraving, issue, etc., of stamps are made applicable only to stamps representing taxes. There is neither directly nor indirectly any reference to stamps issued without cost to cover an exportation free from tax or duty. While in section 3 there is special reference by number to various sections of the Revised Statutes concerning special taxes, and they are made to extend so far as applicable to the taxes authorized by this act, there is nowhere any mention of section 3385, Rev. Stat., which provides for relieving exported manufactured tobacco and snuff from the manufacturing tax. Further, in section 6 it is directed that all sales to exporters of filled cheese shall be in original stamped packages, and this direction is in the same sentence with that providing for sales to wholesale dealers. Clearly there is nothing in the body of the act exempting exported filled cheese from the ordinary manufacturing tax on other filled cheese. But if there were a doubt as to the meaning of the statute that doubt should be resolved in favor of the government. Whoever claims a privilege from the government should point to a statute which clearly indicates the purpose to grant the privilege.
"But if there be any doubt as to the proper construction of this statute, (and we think there is none,) then that construction must be adopted which is most advantageous to the interests of the government. The statute being a grant of a privilege, must be construed most strongly in favor of the grantor. Gildart v. Gladstone, 12 East, 668, 675; Charles River Bridge v. Warren Bridge, 11 Pet. 420, 544; Dubuque & Pacific Railroad v. Litchfield, 23 How. 66; The Binghamton Bridge, 3 Wall. 51, 75; Rice v. Railroad Co., 1 Black, 358, 380; Leavenworth, *432 Lawrence & Galveston Railroad v. United States, 92 U.S. 733; Fertilizing Co. v. Hyde Park, 97 U.S. 659." Hannibal &c. Railroad Co. v. Packet Co., 125 U.S. 260, 271.
Why Congress should grant an exemption from manufacturing tax in the case of exported tobacco and not in the case of exported filled cheese, is not for us to determine. Doubtless the reasons which prompted such difference were satisfactory. It is enough that no exemption has been made in favor of the latter.
The judgment of the Circuit Court was right, and it is
Affirmed.
MR. JUSTICE BROWN did not hear the argument and took no part in the decision of this case.
MR. JUSTICE HARLAN, with whom MR. CHIEF JUSTICE FULLER concurred, dissenting.
As this case went off upon demurrer by the Government to the declaration its material allegations must be taken as true. The case cannot properly be dealt with upon any other basis.
The declaration shows that the plaintiffs in error, who were plaintiffs below, were engaged in the business of manufacturing what is known in commercial circles as filled cheese; and that in execution of certain contracts made with foreign customers the plaintiffs manufactured large quantities of filled cheese, and shipped it by installments, directly from their factory in Illinois to Liverpool and London. It alleged that "each quantity or installment of filled cheese manufactured, exported and delivered by the plaintiffs under said contracts was forwarded by the plaintiffs as soon as the same was ready for shipment from their factory in said district, and prior to the shipment thereof the plaintiffs applied to the defendant as such collector for permission to ship and forward the same without purchasing, and attaching to said filled cheese or to the said packages containing the said filled cheese the revenue stamps required by an alleged *433 act of Congress, approved June 6, A.D. 1896, with reference to internal revenue; but notwithstanding the fact that such filled cheese was manufactured for export, and was about to be delivered by the plaintiffs for export and shipment to a foreign market . . . the defendant did at various times during said period, and on the dates of shipment of said filled cheese, by force, duress, exact," etc.
Upon the occasion of each of the shipments the internal revenue collector exacted and collected (against the protest of the plaintiffs) a tax upon the cheese of one cent per pound, the collector insisting that such a tax was imposed by the act of Congress of June 6, 1896, entitled "An act defining cheese, and also imposing a tax upon and regulating the manufacture, sale, importation, and exportation of `filled cheese.'" 29 Stat. 253, c. 337.
The first question to be considered is whether Congress intended by that act to impose a tax of one cent per pound upon filled cheese manufactured for exportation, and which, it is admitted, was in fact exported immediately after being so manufactured. Such is the case before the court for consideration.
The ninth section of the act of 1896, under which the collection proceeded, provides that "upon all filled cheese which shall be manufactured there shall be assessed and collected a tax of one cent per pound, to be paid by the manufacturer thereof; and any fractional part of a pound in a package shall be taxed as a pound. The tax levied by this section shall be represented by coupon stamps; and the provisions of existing laws governing the engraving, issue, sale, accountability, effacement and destruction of stamps relating to tobacco and snuff, as far as applicable, are hereby made to apply to stamps provided for by this section." § 9.
Observe that the section refers to "existing laws" relating, among other things, to the issue and sale of stamps for tobacco and snuff. That reference, I submit, embraced section 3385 of the Revised Statutes, Title, Internal Revenue, which provides *434 "Manufactured tobacco, snuff, and cigars intended for immediate exportation, may, after being properly inspected, marked, and branded, be removed from the manufactory in bond without having affixed thereto the stamps indicating the payment of the tax thereon. The removal of such tobacco, snuff, and cigars from the manufactory shall be made under such regulations, and after making such entries and executing and filing, with the collector of the district from which the removal is to be made, such bonds and bills of lading, and giving such other additional security as may be prescribed by the Commissioner of Internal Revenue and approved by the Secretary of the Treasury. There shall be affixed to each package of tobacco, snuff, and cigars intended for immediate export, before it is removed from the manufactory, an engraved stamp, indicative of such intention. Such stamp shall be provided and furnished to the several collectors as in the case of other stamps, and be charged to them and accounted for in the same manner; and for the expense attending the providing and affixing thereof, ten cents for each package so stamped shall be paid to the collector on making the entry for such transportation. When the manufacturer has made the proper entries, filed the bonds, and otherwise complied with all the requirements of the law and regulations as herein provided, the collector shall issue to him a permit for the removal, accurately describing the tobacco, snuff, and cigars to be shipped, the number and kind of packages, the number of pounds, the amount of tax, the marks and brands, the State and collection-district from which the same are shipped, the number of the manufactory and the manufacturer's name, the port from which the said tobacco, snuff, and cigars are to be exported, the route or routes over which the same are to be sent to the port of shipment, and the name of the vessel or line by the which they are to be conveyed to the foreign port. The bonds required to be given for the exportation of the tobacco, snuff, and cigars shall be canceled upon the presentation of the proper certificates that said tobacco, snuff, and cigars have been landed at any port without *435 the jurisdiction of the United States, or upon satisfactory proof that after shipment the same were lost at sea."
It requires no argument to prove that, under that section, manufactured tobacco and snuff "intended for immediate exportation" could be exported without payment of any tax and without having affixed thereto any stamp other than "an engraved stamp indicative of such intention." The effect of the reference in the last clause of the ninth section of the act of 1896, to "existing laws governing the engraving, issue, sale, accountability, effacement and destruction of stamps relating to tobacco and snuff" was, I think, to incorporate into that act section 3385 of the Revised Statutes, so far as it could be made applicable to filled cheese, and to allow filled cheese intended for immediate exportation to be removed from the manufactory without payment of any tax, having affixed to it no other stamp than one engraved and indicating the intention to export. In that view, which seems to me incontestable, the purpose of Congress was to put manufactured filled cheese, intended for immediate exportation, upon the same footing as manufactured tobacco and snuff intended for immediate exportation and to permit its exportation without payment of any tax. Certainly section 3385 was one of the existing laws at the date of the passage of the act of 1896, and if applied to that act the result, I submit, must be as just stated. This question is within such narrow compass that it cannot be elucidated by extended discussion; and if the bare reading of the above statutes, all together, does not bring the mind to the conclusion indicated by me, argument to that end would be unavailing.
So I leave that question and come to the proposition that if the act of 1896 is to be construed as imposing a tax upon the plaintiffs' cheese, when about to be exported, then it is in conflict with the Constitution.
The eighth section of Article II of the Constitution enumerates certain powers which Congress may exercise, while the ninth section specifies certain things that Congress may not *436 do. The express words of that instrument are that "no tax or duty shall be laid on articles exported from any State." Manifestly, so far as any prohibitory action by Congress is concerned, the object of that provision was to open the markets of the world to the products and manufactures of the several States, freed from any tax or burden whatever imposed by the United States. This court said in Fairbank v. United States, 181 U.S. 283, 292, that the "purpose of the restriction [on the power of Congress] is that exportation, all exportation, shall be free from national burden."
I do not contend that the owner of an article about to be exported could rightfully ship it to a foreign country, without paying such tax as had legally attached in favor of the Government prior to the date on which the owner formed the purpose to export. An existing property tax upon manufactured articles which had become a part of the general mass of property and was held in the possession of the owner for purposes of sale or use in this country, could not be defeated by reason of the fact that the owner  subsequent to manufacture, and after a substantial interval of time  formed the intention to export it. But that is not this case, although the court seems to treat it as if it were one of that kind. The Government admitted by its demurrer to the declaration that the filled cheese in question was manufactured for exportation; that upon the completion of the manufacture the plaintiff as soon as it was ready for shipment from their factory set about to export it; and that it was ready to be delivered for such exportation, when the collector took the position that before it could be removed from his district and exported, the tax of one cent per pound, imposed by the ninth section of the act of 1896 "upon all filled cheese which shall be manufactured," must be paid. It is, in effect, admitted of record that the plaintiffs never had any other purpose than to export the cheese, as soon as manufactured, in fulfillment of contracts previously made with foreign customers, and that they promptly prepared it for exportation. There was no appreciable interval of time between *437 the commencement of manufacture, and the preparation for exportation, when it could be reasonably said that the cheese had become a part of the general mass of property in the locality of its manufacture for purposes of sale, delivery, or consumption in this country. So that the question arises whether it is consistent with the constitutional injunction, "no tax or duty shall be laid on articles exported from any State," that, at the instant when an articles admittedly manufactured for exportation is being prepared in good faith for exportation, not for sale or consumption here, a national tax be laid on such article as property. If that question be answered in the affirmative, then the purpose of the constitutional restriction, that "all exportation shall be free from national burden," may be defeated; for if, in such circumstances as are disclosed in this case, Congress can impose a tax of one cent per pound on filled cheese, manufactured and intended for immediate exportation, and about to be exported, it can impose such taxes on articles manufactured in this country and intended for immediate exportation as will make it impossible for manufacturers to secure, or will deter them from attempting to secure, contracts with foreign consumers or buyers. The result would be that Congress, in time of peace, and by means of taxation, could bring about a condition of utter occlusion between the manufacturers of this country and the markets of other countries. Indeed, the several States could bring about that result by taxation; for if an article manufactured for exportation and which was prepared for exportation as soon as manufacture was completed, is not an export from the moment such preparation was begun, then a State may impose a tax upon it as property and compel the payment thereof before the article is removed from its limits for exportation. I do not think that the framers of the Constitution contemplated such a condition as possible.
In support of the views expressed in it the opinion reproduces the following observations by Mr. Justice Miller in one of his lectures on Constitutional Law p. (592): "The Congress *438 of the United States, during the late civil war, imposed a tax upon cotton and tobacco, which tax was not limited to those products when in the process of transportation, but was assessed on all the cotton and tobacco in the country. It was argued that because the larger part of these products was exported out of the county and sold to foreign nations, and because their production was limited to a particular part of the country, the tax was forbidden by the corresponding clause of the Constitution prohibiting Congress from levying a tax on exports. Although the question came at that time to the Supreme Court of the United States, it was not then decided, because of a division of opinion in that court. The recent cases, however, of Coe v. Errol, 116 U.S. 517, and Turpin v. Burgess, 117 U.S. 504, seem to decide that the objection was not valid, and hold that only such property as is in the actual process of exportation, and which has begun its voyage or its preparation for the voyage, can be said to be an export."
I submit that these observations do not justify the conclusion announced by the court; for, the eminent jurist who made them says that property is to be deemed an export from the time it is in the actual process of exportation and "its preparation for the voyage" has begun. That is, in substance, the precise principle for which I am contending. Whilst the cheese was in the process of being manufactured, it was not of course a subject of taxation under the statute. It became manufactured filled cheese only when manufacture was completed. But, as soon as it was manufactured and prepared for shipment, and when it was about to be started on its journey to Europe, the collector exacted from the plaintiffs the property tax imposed by the act of 1896. In my judgment, within the meaning of the Constitution, and in every just sense, the cheese was in the actual process of exportation, and became an export from the moment when, immediately after the completion of manufacture, without loss of time, the plaintiffs, in good faith, prepared it for shipment in fulfillment of their contracts with foreign customers. In the Fairbank case the court held that *439 a mere stamp tax on a bill of lading taken at the time articles were shipped from a State to a foreign country was a tax on the articles themselves as exports, and was forbidden by the constitutional provision that no tax or duty shall be laid on articles exported from any State. It is now held that a tax on articles admittedly manufactured only for exportation and not for sale or consumption in this country, and which are exported as soon as they can be made ready for shipment, after the completion of manufacture, in execution of contracts entered into prior to the commencement of manufacture, is a tax on the articles themselves as property and not on them as exports. In short, the effect of the present decision is to say that, if Congress so wills, articles manufactured in this country, although manufactured only for exportation, and not for sale or consumption here, cannot be exported to other countries, except subject to such tax as Congress may choose to impose on the manufactured articles as property. Thus, despite the express prohibition of all taxes or duties upon articles exported from the States, Congress is recognized as having the same power over exports from the several States as it has exercised over imports from foreign countries. I do not think it has such power.
The views I have expressed are not in conflict with the judgment in Turpin v. Burgess, 117 U.S. 504, cited in the opinion of the court. That was not a case of a property tax upon a manufactured article intended for exportation, but a mere stamp tax imposed by the internal revenue law upon manufactured tobacco, and placed upon the tobacco in order to indicate the purpose to export it. The only issue was as to the validity of the statute imposing that stamp tax. There was nothing to show any purpose to export the goods immediately upon the completion of manufacture. The goods remained in the factory, and the court said that they "might never be exported," and "whether they would be or not would depend altogether on the will of the manufacturer." There was no showing of preparation for exportation as soon as such *440 preparation could begin after manufacture. In the present case, as we have seen, it is admitted that the filled cheese was manufactured for exportation and was being prepared, immediately after manufacture, for exportation. The tax here was, in effect, collected while the cheese was being made ready for exportation, and therefore, to use the words of Turpin v. Burgess, whilst it "was being exported."
For the reasons stated, I am constrained to dissent from the opinion and judgment of the court.
I am authorized to say that the CHIEF JUSTICE concurs in this opinion.