# KOSYDAR, TAX COMMISSIONER OF OHIO *v.* NATIONAL CASH REGISTER CO.

No. 73–629. Argued March 19, 1974—Decided May 20, 1974

Stewart, J., delivered the opinion for a unanimous Court.

*Dwight C. Pettay, Jr.,* Assistant Attorney General of Ohio, argued the cause for petitioner. With him on the briefs were *William J. Brown,* Attorney General, and *Maryann B. Gall,* Assistant Attorney General.

*Roger F. Day* argued the cause for respondent. With him on the brief was *Carlton S. Dargusch, Jr.*

Mr. Justice Stewart delivered the opinion of the Court.

The Import-Export Clause of the Constitution, Art. I, § 10, cl. 2, provides:

> "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspection Laws: and the net Produce of all Duties and Imports, laid by any State on

Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul · of the Congress."

The issue for decision in this case is whether the assessment of an ad valorem personal property tax by the petitioner Tax Commissioner of Ohio upon certain property of the respondent is in conflict with this Clause.

## I

The respondent National Cash Register Co. (NCR) has for many years engaged in the manufacture of cash registers, accounting machines, and electronic data processing systems, which it markets worldwide. Its home offices, main production plant, and warehouse are located in Dayton, Ohio. For marketing purposes, NCR is organized into two divisions, domestic and international, each wholly separated from the other. It is with the operations of the latter division that this case is concerned.

NCR maintains no inventory of machines which are available to meet incoming orders from foreign customers. Rather, when a salesman from the international division receives an order from a customer, an individual order form is completed. The machine is then built to specification, taking into account the commercial peculiarities of the country to which it is to be shipped and the buyer's individual needs.

After manufacture, the machine is inspected, packed, and crated for shipment abroad. The crated machine is then taken to an NCR warehouse in Dayton, to await foreign shipment.[1] The machines relevant to

---

[1] There is often a time lag between production and final shipment, and an inventory of international machines is therefore built up at the Dayton warehouse. The delays in eventual shipment occur for a

this case were in storage in the Dayton warehouse, awaiting shipment, on December 31, 1967, when the petitioner Tax Commissioner assessed a personal property tax upon them.[2]

NCR appealed the Commissioner's assessment to the Board of Tax Appeals of the Ohio Department of Taxation. Its basic claim was that the "international inventory" in the Dayton warehouse was made up of exports, and thus was immune from state taxation under the Import-Export Clause. In support of this contention, NCR offered evidence to show that, because of their unique construction and special adaptation for foreign use, the crated machines were not salable domestically. Further evidence was offered to show that no piece of equipment built for the international division has ever gone anywhere but into that division; that there is no recorded instance of a machine that was sold to a foreign purchaser being returned; and that no exported item has ever found its way back into the United States market.[3]

---

number of reasons. In some cases, recipient countries will not allow partial shipments, so when a large order has been placed and the production cycle is slow, the machines must be consolidated and stored prior to shipment. In the electronic data processing area, the component parts of a shipment are often produced at several different locations, necessitating a consolidation prior to shipment. In other instances, delay in final shipment is caused by difficulties in procuring importation licenses or the uncertainties of the international monetary situation.

[2] Under Ohio Rev. Code Ann. § 5709.01, all personal property located and used in business within the State is subject to an ad valorem tax. Ohio Rev. Code Ann. § 5711.16 provides that articles which have at any time been manufactured are subject to the tax.

[3] A number of factors make domestic sales of the machines impractical. For one thing, the keyboards, printing mechanisms, characters, dispensing mechanisms, and decimal point placement of the machines are geared to the particular monetary system employed

The Board of Tax Appeals nonetheless upheld the Commissioner's assessment. It ruled that even if the crated machines were irrevocably committed to export, the immunity from state taxation conferred by Art. I, § 10, cl. 2, did not attach until the property actually started on its journey to a foreign destination. Since the machines here had not yet entered the export stream, the Board of Tax Appeals concluded that they were still subject to the personal property tax.

The Supreme Court of Ohio reversed this decision by a divided vote. 35 Ohio St. 2d 166, 298 N. E. 2d 559. Relying on the evidence about the domestic nonsalability of the machines, the state court concluded that there was a "certainty of export" in this case. Given that "certainty," the court thought it irrelevant for Import-Export Clause purposes that the taxed machines had not, on the date of the assessment, been moved from the storage facility in Dayton. We granted certiorari, 414 U. S. 1111, because the case seemed to present important questions touching the accommodation of state and federal interests under the Constitution.

## II

By its own terms, the prohibition on taxation contained in the Import-Export Clause is absolute; no duties or imposts are allowed "except what may be absolutely necessary for executing [a State's] inspection Laws." [4]

---

in the customer's country. Moreover, the machines are quite often designed for use on electrical systems not prevalent in this country. And, even when mechanical problems do not exist, the fact remains that merchandising techniques in this country are considerably more sophisticated than those in many other nations, so as to make machines designed for foreign use somewhat obsolete in the domestic market.

[4] There is no claim that this exception is applicable in any way in the present case.

Consequently, the essential question in cases involving the Clause is a narrow one: is the property upon which a tax has been sought to be imposed an "export," and thus entitled to protection under the provision's literal terms?

The seminal case on the subject is *Coe* v. *Errol,* 116 U. S. 517. *Coe* involved a shipment of spruce logs that had been hewn at various locations in Maine and New Hampshire, and were to be floated down the Androscoggin River for manufacture and sale in Lewiston, Maine. The logs were detained by low water in the town of Errol, New Hampshire, where the local selectmen assessed a number of taxes upon them. The owners of the logs contested the assessments, claiming that the property was immune from taxation under both the Commerce and Import-Export Clauses, since the river served as a "public highway" for the interstate shipment of timber. The Supreme Court of New Hampshire sustained the tax, and this Court affirmed.

Writing for the Court, Mr. Justice Bradley viewed "the precise question for solution" as follows:

> "Do the owner's state of mind in relation to the goods, that is, his intent to export them, and his partial preparation to do so, exempt them from taxation?" *Id.,* at 525.

That question was answered in the negative. Recognizing that its task was to set a "point of time when State jurisdiction over the commodities of commerce begins and ends," *id.,* at 526, the Court concluded that

> "such goods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, *until they have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation in a*

*continuous route or journey."  Id.,* at 527 (emphasis added).

Since the logs in *Coe* had not begun a "final movement for transportation from the State of their origin to that of their destination," *id.,* at 525, the Court held that the Constitution provided no immunity from local taxation.

The basic principle of *Coe* v. *Errol* is a simple one— the exemption from taxation in the Import-Export Clause "attaches to the export and not to the article before its exportation." *Cornell* v. *Coyne,* 192 U. S. 418, 427. This Court has adhered to that principle in the almost 90 years since *Coe* was decided, and the essential problem in cases involving the constitutional prohibition against taxation of exports has therefore been to decide whether a sufficient commencement of the process of exportation has occurred so as to immunize the article at issue from state taxation. Of necessity, the inquiry has usually been a factual one. For example, in *A. G. Spalding & Bros.* v. *Edwards,* 262 U. S. 66, this Court decided that delivery of baseballs and bats to an export carrier for shipment to Venezuela constituted a significant "step in exportation," *id.,* at 68, and exempted the goods from a federal revenue tax.[5] Similarly, in *Richfield Oil Corp.* v. *State Board of Equalization,* 329 U. S. 69, it was held that the delivery of oil into the storage tanks of a New Zealand-bound steamer "marked the commencement of the movement of the oil abroad," *id.,* at 83, making the product immune from a California sales tax.

---

[5] The *Spalding* case arose under Art. I, § 9, cl. 5, of the Constitution, which provides that "No Tax or Duty shall be laid on Articles exported from any State." A long line of cases has recognized, however, that the meaning of "export" is the same under that provision as under the Import-Export Clause. See, *e. g., Brown* v. *Maryland,* 12 Wheat. 419, 445; *Turpin* v. *Burgess,* 117 U. S. 504, 506; *Cornell* v. *Coyne,* 192 U. S. 418, 427–428; *Richfield Oil Corp.* v. *State Board of Equalization,* 329 U. S. 69, 83.

Yet, even if the inquiry in cases like *Spalding* and *Richfield Oil* was specifically directed at determining whether particular acts of movement toward a final destination constituted sufficient entrance into the export stream to invoke the protection of the Import-Export Clause, this Court has never lost sight of one basic principle—at least *some* such entrance is a prerequisite to the Clause's operation. That fact is well illustrated by the opinion of the Court in *Empresa Siderurgica* v. *County of Merced,* 337 U. S. 154. That case involved a California cement plant, which had been sold to a Colombian buyer. Title to the property had passed to the buyer, and a common carrier had begun to dismantle the plant and crate it for shipment to Colombia.

At a stage when 12% of the plant had been shipped out of the country, the county of Merced levied a personal property tax on the remaining 88%. This balance included about 10% of the original plant that had been dismantled and crated or prepared for shipment, but which had not yet begun its voyage to Colombia. This Court held that the tax on the 88%, including this crated portion, did not violate the Import-Export Clause. Adhering to the test of *Coe* v. *Errol,* the Court stated:

> "Under that test it is not enough that there is an intent to export, or a plan which contemplates exportation, or an integrated series of events which will end with it. . . . It is the entrance of the articles into the export stream that marks the start of the process of exportation. Then there is certainty that the goods are headed for their foreign destination and will not be diverted to domestic use. Nothing less will suffice." *Id.,* at 156–157.

Since the 88% of the cement plant had not yet begun its out-of-state journey, the Court concluded that the Cali-

fornia tax was not one upon "exports" within the meaning of the Clause.[6]

We can find little in the case before us to take it outside the ambit of the *Empresa Siderurgica* holding. At the time that the respondent's machines were assessed for taxation, they were sitting in the Dayton warehouse awaiting shipment. Title and possession were in NCR, payment had not yet been made by the putative purchasers, no export license had issued, and the machines were in the complete control of the respondent. More important, there had simply been no movement of the goods—no shipment, and no commencement of the process of exportation. Given this factual setting, it would require a sharp departure from nearly a century of precedents under the Import-Export Clause for us to conclude that the machines were "exports" and exempt from state taxation.

In an effort to avoid the clear holdings of our prior cases, NCR emphasizes the peculiar nature of the taxed machines, and contends that their nonadaptability to domestic use brought about a "certainty of export." Because of this practical absence of "diversion potential,"

---

[6] In a decision rendered two weeks after *Empresa Siderurgica,* the Court made it clear that not every preliminary movement of goods toward eventual exportation was sufficient to invoke the protection of the Import-Export Clause. In *Joy Oil Co.* v. *State Tax Comm'n,* 337 U. S. 286, the question was whether an ad valorem property tax on gasoline stored in tanks at Dearborn, Michigan, for eventual export to Canada, was permissible under the Clause. The gasoline had previously been purchased by a Canadian corporation, had been certified as purchased for export, shipped by rail to Detroit under bills of lading marked "For Export to Canada," and eventually placed in the Dearborn tanks. The bulk of the gasoline remained in the tanks for over 15 months, because of an apparent shortage of shipping space by water. This Court held that, despite the initial transportation of the gasoline to Dearborn, the hiatus in the journey subjected the property to state taxation.

NCR argues that the ultimate placement of the machines into the stream of exportation is a mere formality, and that this Court should treat the crated property as already having become an export in the constitutional sense even as it sits in the Dayton warehouse.

As a practical matter, it might well be doubted that the "diversion potential" of the crated portions of the cement plant in *Empresa Siderurgica* was any greater than that present here.[7] But, even assuming, *arguendo,* the validity of NCR's arguments about the practical certainty of export here, we think it plain that the warehoused machines are not entitled to the protection of the Import-Export Clause. Mr. Justice Frankfurter put the matter succinctly in *Joy Oil Co.* v. *State Tax Comm'n,* 337 U. S. 286, 288:

> "The Export-Import Clause was meant to confer immunity from local taxation upon property being exported, not to relieve property eventually to be exported from its share of the cost of local services."

We may accept as fact the respondent's assurances that the prospect of eventual exportation here was virtually certain. "But that prospect, no matter how bright, does not start the process of exportation. On the tax date the movement to foreign shores had neither started nor been committed." *Empresa Siderurgica,* 337 U. S., at 157. Given the absence of an entrance of the respond-

---

[7] Indeed, it might well be contended that in this case: "There is no certainty of export. The record establishes that some machines have remained stored in the warehouse awaiting shipment for three years. The orders could be cancelled, the export license might never issue, the financing may fail to materialize, the machines could be destroyed, dismantled or sold for scrap. These machines were no different from any other mass of goods in a warehouse awaiting shipment." 35 Ohio St. 2d 166, 175, 298 N. E. 2d 559, 564–565 (O'Neill, C. J., dissenting).

ent's machines into the export stream, the immunities of the Import-Export Clause are unavailable.

It may be said that insistence upon an actual movement into the stream of export in the case at hand represents an overly wooden or mechanistic application of the *Coe* doctrine. This is an instance, however, where we believe that simplicity has its virtues. The Court recognized long ago that even if it is not an easy matter to set down a rule determining the moment in time when articles obtain the protection of the Import-Export Clause, "it is highly important, both to the shipper and to the State, that it should be clearly defined so as to avoid all ambiguity or question." *Coe,* 116 U. S., at 526. As Mr. Justice Holmes put the matter in *A. G. Spalding,* 262 U. S., at 69:

> "[W]e have to fix a point at which, in view of the purpose of the Constitution, the export must be said to begin. As elsewhere in the law there will be other points very near to it on the other side, so that if the necessity of fixing one definitely is not remembered any determination may seem arbitrary."

Our prior cases have determined that the protections of the Import-Export Clause are not available until the article at issue begins its physical entry into the stream of exportation. We find no reason to depart from that settled doctrine.

For these reasons, the judgment of the Supreme Court of Ohio is

*Reversed.*