**MARATHON ASHLAND PETROLEUM L.L.C., Now Known as, Marathon Petroleum Company LLC, Appellant,**

v.

**GALVESTON CENTRAL APPRAISAL DISTRICT, Appellee.**

No. 01–06–00531–CV.

Court of Appeals of Texas, Houston (1st Dist.).

July 6, 2007.

Rosemarie Kanusky, Edward Kliewer III, W. Wendell Hall, Fulbright & Jaworski LLP, San Antonio, TX, for Appellant.

Anthony P. Brown, McLeod, Alexander, Powel & Apffel, P.C., Galveston, TX, for Appellee.

Panel consists of Justices HANKS, BLAND, and DORFMAN.*

## OPINION

JANE BLAND, Justice.

In this ad valorem tax case resolved on cross motions for summary judgment, Marathon Ashland Petroleum L.L.C. (Marathon) [1] appeals the trial court's judgment in favor of Galveston Central Appraisal District (GCAD). Marathon contends the trial court erred because GCAD's taxation of Marathon's petroleum products awaiting transportation to out-of-state customers violates the Commerce Clause of the United States Constitution. *See* U.S. Const. art. I, § 8, cl. 3. We conclude that the petroleum products GCAD seeks to tax had not entered the stream of interstate commerce on the date of assessment. Thus, the Commerce Clause does not shield these goods from the state property tax. We therefore affirm.

## Background

Marathon owns an oil and gas refinery in Texas City, and it produces petroleum products for its customers. Upon comple-

tion of the refining process, Marathon segregates petroleum products destined exclusively for out-of-state customers from its processing units into refinery tanks it designates to hold solely those products it intends to later ship out-of-state. The refined products remain in the tanks for three to eight days before leaving the refinery.

Independent common carriers take the petroleum products from Marathon's tanks, either by barge or through one of two pipelines. The pipeline carriers require the products to meet certain regulatory requirements and specifications before they will transport them. Marathon tests the products in its tanks during the three to eight-day interval to ensure compliance with the regulatory requirements and specifications.

The pipelines connect to Marathon's tanks at a manifold containing two valves. Marathon controls one of the valves and the pipeline carriers control the other valve. Marathon must ensure that its valve is open at the time specified by the pipeline carriers so that the pipeline carriers can take the products. When the pipeline carriers are ready to take the products, they open their valve and the manifold pumps the products into the pipeline.

The nature of the petroleum refining business dictates that Marathon participate in a "nomination" process with various pipeline and barge companies to arrange for the transportation of its products. The nomination process requires Marathon to bid for space with the pipeline carriers. Once the pipeline carriers accept a nomination, they set a

---

* The Honorable Grant Dorfman, judge of the 129th District Court of Harris County, participating by assignment. *See* TEX. GOV'T CODE ANN § 74.003(h) (Vernon 2005).

1. Marathon Ashland Petroleum L.L.C. is now known as Marathon Petroleum Company LLC.

date for the transportation of the product. Marathon often must nominate its products for transportation before refining begins. Marathon can change the final destination of nominated products, but this occurs rarely, and did not occur in this instance.

Marathon elected to have its inventory appraised as of September 1, 2003 for the 2004 tax year. *See* TEX. TAX CODE ANN. § 23.12(f) (Vernon 2001). GCAD valued Marathon's inventory at $41,437,170. Of this figure, $13,991,393 represents the value of petroleum products in Marathon's tanks then awaiting transportation to out-of-state customers. After the appraisal review board rejected Marathon's tax protest as to its out-of-state products, Marathon sued GCAD, asserting that the tax violates the Commerce Clause of the United States Constitution. GCAD and Marathon both moved for summary judgment. The trial court granted GCAD's summary judgment, denied Marathon's summary judgment, and concluded that the products in Marathon's tanks had not entered the stream of interstate commerce on September 1, 2003, and thus are not exempt from local ad valorem taxation. *See id.* § 11.12 (Vernon 2001) ("Property exempt from ad valorem taxation by federal law is exempt from taxation.").

## Interstate Commerce

In its first and second issues, Marathon contends that the trial court erred in denying its summary judgment and granting summary judgment in favor of GCAD because the ad valorem taxation of Marathon's petroleum products awaiting transportation to out-of-state customers violates the Commerce Clause of the United States Constitution. *See* U.S. Const. art. I, § 8, cl. 3. GCAD responds that the Commerce Clause does not protect Marathon's petroleum products from ad valorem taxation

because the products awaiting transportation to out-of-state customers have not entered the stream of interstate commerce.

### A. Standard of Review

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005); *Provident Life Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex.2003). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Dorsett*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215; *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997). Under Texas Rule of Civil Procedure 166a(c), the party moving for summary judgment bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Knott*, 128 S.W.3d at 215-16. When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered. *See Dorsett*, 164 S.W.3d at 661; *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

### B. Dormant Commerce Clause

The Commerce Clause of the United States Constitution expressly grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, 8, cl. 3. The United States Supreme Court has held that the Commerce Clause prohibits cer-

tain state regulation of interstate commercial activity. *Okla. Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 179-80, 115 S.Ct. 1331, 1335-36, 131 L.Ed.2d 261 (1995); *Quill Corp. v. North Dakota,* 504 U.S. 298, 309, 112 S.Ct. 1904, 1911, 119 L.Ed.2d 91 (1992). This implicit principle is known as the "dormant Commerce Clause." *Okla. Tax Comm'n,* 514 U.S. at 179, 115 S.Ct. at 1335.

The Supreme Court's decision in *Complete Auto Transit, Inc. v. Brady* governs the modern analysis of state taxes on interstate commerce under the Commerce Clause. 430 U.S. 274, 288, 97 S.Ct. 1076, 1083, 51 L.Ed.2d 326 (1977); *Vinmar, Inc. v. Harris County Appraisal Dist.,* 947 S.W.2d 554, 555 (Tex.1997); *Diamond Shamrock Ref. & Mktg. Co. v. Nueces County Appraisal Dist.,* 876 S.W.2d 298, 301 (Tex.1994). In *Brady,* the Court abandoned the abstract notion that the states cannot tax interstate commerce "itself." *See D.H. Holmes Co. v. McNamara,* 486 U.S. 24, 30, 108 S.Ct. 1619, 1623, 100 L.Ed.2d 21 (1988); *Diamond Shamrock,* 876 S.W.2d at 301. Rather, the Court held that, to be valid, a state tax must: (1) apply to an activity with a substantial nexus with the taxing state; (2) be fairly apportioned; (3) not discriminate against interstate commerce; and (4) be fairly related to the services provided by the state. *Brady,* 430 U.S. at 279, 287, 97 S.Ct. at 1079, 1083; *see also Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 444–45, 99 S.Ct. 1813, 1819, 60 L.Ed.2d 336 (1979); *Diamond Shamrock,* 876 S.W.2d at 301; *Harris County Appraisal Dist. v. Transamerica Container Leasing Inc.,* 920

S.W.2d 678, 682 (Tex.App.-Houston [1st Dist.] 1995, writ denied).

Goods that have not yet entered the stream of interstate commerce, however, are part of the general mass of property in a state and are subject to state taxation in the usual way. *Coe v. Town of Errol,* 116 U.S. 517, 527, 6 S.Ct. 475, 478, 29 L.Ed. 715 (1886). Under these circumstances, the *Brady* test does not apply. *See id.; see also Brady,* 430 U.S. at 279, 287, 97 S.Ct. at 1079, 1083. In *Coe v. Town of Errol,* the Supreme Court held that goods do not enter the stream of interstate commerce "until they have been shipped, or entered with a common carrier for transportation, to another state, or have been started upon such transportation in a continuous route or journey." 116 U.S. at 527, 6 S.Ct. at 478; *see also Kosydar v. Nat'l Cash Register Co.,* 417 U.S. 62, 66–67, 94 S.Ct. 2108, 2111, 40 L.Ed.2d 660 (1974) (applying same test in case involving Import–Export Clause). For goods to be in interstate commerce, "[i]t must appear that the movement for another state has actually begun and is going on." *Hughes Bros. Timber Co. v. Minnesota,* 272 U.S. 469, 475, 47 S.Ct. 170, 172, 71 L.Ed. 359 (1926). The mere intention to send goods out-of-state does not place them in interstate commerce, nor does preparatory gathering for that purpose at a depot or entrepot. *Id.; Coe,* 116 U.S. at 527, 6 S.Ct. at 478.

The United State Supreme Court has applied the *Coe* test in its construction of the Commerce Clause,[2] the Import–Export Clause,[3] and the Export Clause.[4] *See Ko-*

---

**2.** U.S. Const. art. I, § 8, cl. 3 ("The Congress shall have Power ... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes....").

**3.** U.S. Const. art. I, § 10, cl. 2 ("No State shall, without the Consent of the Congress,

lay any Imposts or Duties on Imports or Exports....").

**4.** U.S. Const. art. I, § 9, cl. 5 ("No Tax or Duty shall be laid on Articles exported from any State.").

*sydar,* 417 U.S. at 66–67, 94 S.Ct. at 2111 (Import–Export Clause); *Cornell v. Coyne,* 192 U.S. 418, 427–28, 24 S.Ct. 383, 384–85, 48 L.Ed. 504 (1904) (Export Clause); *Coe,* 116 U.S. at 527, 6 S.Ct. at 478 (Commerce Clause). In each line of cases, the Court has held that the three clauses do not apply until goods become exports or enter the stream of interstate commerce under the *Coe* test. *See Kosydar,* 417 U.S. at 66–67, 94 S.Ct. at 2111; *Cornell,* 192 U.S. at 427–28, 24 S.Ct. at 384–85; *Coe,* 116 U.S. at 527, 6 S.Ct. at 478. Cases involving all three clauses are therefore instructive in our application of the *Coe* test to the facts of this case.

In *Coe,* the Court upheld a tax on logs placed on the bank of a river although it was undisputed that the owner intended to ship the logs out of the state. 116 U.S. at 527, 6 S.Ct. at 478. Coe placed some logs on the bank of Clear Stream in the Town of Errol, New Hampshire. *Id.* at 518, 6 S.Ct. at 475. Coe had cut the logs the winter before and intended to float them down the Androscoggin River to Maine. *Id.* The Town of Errol assessed a tax on the logs. *Id.* Coe sued, challenging the tax under the Commerce Clause. *Id.* at 520, 6 S.Ct. at 476. The Court upheld the tax, holding that goods intended for exportation do not cease to be part of the general mass of property in a state, and as such, are subject to taxation in the usual way. *Id.* at 527, 6 S.Ct. at 478. The Court reasoned that Coe could change his mind with regard to his plans for exportation, and the logs might never be exported. *Id.* at 526, 6 S.Ct. at 478. The Court observed that it would be "untenable to hold that a crop or a herd is exempt from taxation merely because it is, by its owner, intended for exportation." *Id.* at 527, 6 S.Ct. at 478. The Court recognized:

> There must be a point of time when [goods] cease to be governed exclusively by the domestic law, and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the state of their origin to that of their destination. When the products of the farm or the forest are collected, and brought in from the surrounding country to a town or station serving as an *entrepot* for that particular region, whether on a river or a line of railroad, such products are not yet exports; nor are they in process of exportation; nor is exportation begun until they are committed to the common carrier for transportation out of the state to the state of their destination, or have started on their ultimate passage to that state.

*Id.* at 525, 6 S.Ct. at 477. The Court held that because the logs had not begun a "final movement for transportation from the state of their origin to that of their destination," the Constitution provided no immunity from local taxation. *Id.*

Similarly, in *Kosydar v. National Cash Register Co.,* the Court upheld a tax on cash registers awaiting shipment to foreign countries. 417 U.S. at 69, 94 S.Ct. at 2112–13. National Cash Register Co. (NCR) manufactured cash registers and sold them in foreign countries. *Id.* at 63, 94 S.Ct. at 2109–10. NCR did not maintain an inventory of registers; it built each register after the customer ordered it. *Id.* at 63, 94 S.Ct. at 2110. After manufacture, NCR inspected, packed, and crated the registers for shipment abroad. *Id.* NCR then sent the registers to its warehouse to await shipment. *Id.* The tax commissioner assessed an ad valorem tax on the registers at the warehouse, and NCR sued, challenging the tax as violative of the Import–Export Clause. *Id.* at 63–65, 94 S.Ct. at 2110–11. Using the test from *Coe,*

the Court upheld the tax on the ground that the registers at the warehouse were not yet exports. *Id.* at 69, 94 S.Ct. at 2112–13. At the time the tax was assessed, the registers were in NCR's warehouse awaiting shipment. *Id.* at 69, 94 S.Ct. at 2112. NCR had title and possession of the registers, and the process of exportation and shipment had not yet begun. *Id.* at 69, 94 S.Ct. at 2112–13. The court disregarded the fact that NCR designed the registers for use in foreign countries, and there was almost no possibility they could be sold in the United States. *Id.* at 70, 94 S.Ct. at 2113; *see also Empresa Siderurgica v. County of Merced,* 337 U.S. 154, 157, 69 S.Ct. 995, 997, 93 L.Ed. 1276 (1949) (holding that prospect of export, no matter how bright, does not start process of exportation).

In contrast, in *Richfield Oil Corp. v. State Board of Equalization,* the Court struck down a tax on oil that had been loaded onto a ship bound for New Zealand. 329 U.S. 69, 71–72, 86, 67 S.Ct. 156, 158, 165, 91 L.Ed. 80 (1946). Richfield sold some oil to the New Zealand government and pumped the oil from a storage tank in California onto a ship bound for New Zealand. *Id.* at 71, 67 S.Ct. at 158. California assessed a sales tax against Richfield measured by the gross receipts from the transaction. *Id.* at 71–72, 67 S.Ct. at 158. Richfield challenged the tax as violative of the Import–Export Clause of the Constitution. *Id.* at 72, 67 S.Ct. at 158. Using the test from *Coe,* the Court held that the oil on the ship was in the process of exportation, and that a tax on the oil violated the Import–Export Clause. *Id.* at 79, 67 S.Ct. at 161–62. The Court reasoned that "[t]he certainty that the goods are headed to sea and that the process of exportation has started may normally be best evidenced by the fact that they have been delivered to a common carrier for that purpose." *Id.* at

82, 67 S.Ct. at 163 (footnote omitted). The Court stated:

> The foreign purchaser furnished the ship to carry the oil abroad. Delivery was made into the hold of the vessel from the vendor's tanks located at the dock. That delivery marked the commencement of the movement of the oil abroad. It is true, as the Supreme Court of California observed, that at the time of the delivery the vessel was in California waters and was not bound for its destination until it started to move from the port. But when the oil was pumped into the hold of the vessel, it passed into the control of a foreign purchaser and there was nothing equivocal in the transaction which created even a probability that the oil would be diverted to domestic use. It would not be clearer that the oil had started upon its export journey had it been delivered to a common carrier at an inland point. The means of shipment are unimportant so long as the certainty of the foreign destination is plain.

*Id.* at 82–83, 67 S.Ct. at 163–64. The Court held that because the oil on the ship had begun the process of exportation under the *Coe* test, the Import–Export Clause applied to the transaction and invalidated the tax. *Id.* at 82–83, 86, 67 S.Ct. at 163–65.

In *Coe* and *Kosydar,* the goods sought to be taxed were intended for exportation out-of-state, but had not yet been shipped, entered with a common carrier for transportation to another state, or started upon such transportation in a continuous route or journey. *See Kosydar,* 417 U.S. at 66–67, 94 S.Ct. at 2111; *Coe,* 116 U.S. at 527, 6 S.Ct. at 478. Thus, Marathon's intention to ship its products out-of-state does not place them into the stream of interstate commerce. *See Hughes Bros. Timber Co.,* 272 U.S. at 475, 47 S.Ct. at

172 ("Mere intention by the owner ultimately to send the logs out of the state does not put them in interstate commerce, nor does preparatory gathering for that purpose at a depot."); *Coe,* 116 U.S. at 527, 6 S.Ct. at 478.

■ The nomination process also does not place Marathon's products into the stream of interstate commerce. *See Empresa Siderurgica,* 337 U.S. at 157, 69 S.Ct. at 997. In *Empresa Siderurgica v. County of Merced,* the Court expressly held that the prospect of export, no matter how bright, does not start the process of exportation. *Id.; see also Kosydar,* 417 U.S. at 69–70, 94 S.Ct. at 2113 (holding that registers specifically designed for foreign countries had not begun process of exportation when they were waiting in warehouse to be shipped). Earmarking products for transportation on a certain day with a common carrier is not the same as actually delivering the products to the common carrier for transportation. *Compare Mich.-Wis. Pipe Line Co. v. Calvert,* 347 U.S. 157, 167–68, 74 S.Ct. 396, 401–02, 98 L.Ed. 583 (1954) (holding that taking of gas into common carrier's pipeline placed gas into stream of interstate commerce), *and Richfield Oil Corp.,* 329 U.S. at 82–83, 67 S.Ct. at 163–64 (holding that oil on ship bound for New Zealand had begun process of exportation), *with Kosydar,* 417 U.S. at 69, 94 S.Ct. at 2112–13 (holding that registers waiting in warehouse to be shipped had not begun process of exportation), *and Coe,* 116 U.S. at 527, 6 S.Ct. at 478 (holding that logs on bank of stream waiting to be transported had not yet entered stream of interstate commerce).

Additionally, Marathon has the power to change the destination of the products in its tanks. *See Coe,* 116 U.S. at 528, 6 S.Ct. at 479. While a representative of Marathon testified that this rarely occurs, and probably would require Marathon to breach a contract, these factors are not dispositive. *See Kosydar,* 417 U.S. at 69–70, 94 S.Ct. at 2113; *Empresa Siderurgica,* 337 U.S. at 157, 69 S.Ct. at 997; *Coe,* 116 U.S. at 528, 6 S.Ct. at 479.

Unlike the oil pumped onto the ship in *Richfield Oil Corp.,* Marathon maintains complete control over the products in its tanks. *See* 329 U.S. at 83, 67 S.Ct. at 164. Marathon must open a valve to allow the pipeline carriers to remove the products from the tanks, and the pipeline carriers will not remove the products until Marathon conducts tests to ensure the products meet certain regulatory requirements and specifications. While Marathon does not control when the pipeline carriers take the products from the tanks, it does control their ability to take the products. Control is an important factor in determining whether the goods have begun the process of exportation or entered the stream of interstate commerce under the *Coe* test. *See Kosydar,* 417 U.S. at 69, 94 S.Ct. at 2112–13; *Empresa Siderurgica,* 337 U.S. at 157, 69 S.Ct. at 997; *Richfield Oil Corp.,* 329 U.S. at 83, 67 S.Ct. at 164; *Coe,* 116 U.S. at 526, 6 S.Ct. at 478; *Va. Indon. Co. v. Harris County Appraisal Dist.,* 910 S.W.2d 905, 912–13 (Tex.1995).

Marathon's movement of the products from the processing units to the tanks is similar to the movement of the logs to the bank of the river in *Coe,* or the movement of the registers to the warehouse in *Kosydar.* *See Kosydar,* 417 U.S. at 63–64, 94 S.Ct. at 2110; *Coe,* 116 U.S. at 518, 6 S.Ct. at 475. Like the bank of the river in *Coe,* or the warehouse in *Kosydar,* Marathon's tanks serve as a depot where its products await transportation by the pipeline carriers. *See Kosydar,* 417 U.S. at 69, 94 S.Ct. at 2112–13; *Coe,* 116 U.S. at 525, 6 S.Ct. at 477. Gathering goods at a depot or entrepot in preparation for their journey out-of-state does not place them in the stream of

interstate commerce. *See Hughes Bros. Timber Co.*, 272 U.S. at 475, 47 S.Ct. at 172; *Coe*, 116 U.S. at 527, 6 S.Ct. at 478. As was stated in *Coe*,

> The carrying of [goods] in carts or other vehicles, or even floating them, to the depot where the journey is to commence, is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. Until actually launched on its way to another state, or committed to a common carrier for transportation to such state, its destination is not fixed and certain. It may be sold or other wise disposed of within the state, and never put in course of transportation out of the state. Carrying it from the farm or the forest to the depot is only an interior movement of the property, entirely within the state, for the purpose, it is true, but only for the purpose, of putting it into a course of exportation. *It is no part of the exportation itself.*

116 U.S. at 528, 6 S.Ct. at 479 (emphasis added).

We hold that the petroleum products in Marathon's tanks awaiting transportation to out-of-state customers have not entered the stream of interstate commerce because they have not commenced their movement out of Texas. *See id.* at 525, 6 S.Ct. at 477. Marathon's products have not been shipped, entered with a common carrier for transportation to another state, or started upon such transportation in a continuous route or journey. *See id.* at 525–27, 6 S.Ct. at 477–78; *see also Kosydar*, 417 U.S. at 66–67, 94 S.Ct. at 2111; *Empresa Siderurgica*, 337 U.S. at 157, 69 S.Ct. at 997; *Richfield Oil Corp.*, 329 U.S. at 82–83, 67 S.Ct. at 163–64; *Champlain Realty Co. v. Town of Brattleboro*, 260 U.S. 366, 373, 43 S.Ct. 146, 148, 67 L.Ed.

309 (1922); *but cf. Va. Indon. Co.*, 910 S.W.2d at 912 (holding that goods entered stream of commerce when they were shipped from vendor to export packer's facility because at that point, goods had begun their movement to precommitted foreign destination). Marathon's products are therefore part of the general mass of property in Texas and subject to the ad valorem tax assessed by GCAD. *See Coe*, 116 U.S. at 527, 6 S.Ct. at 478.

Additionally, GCAD's ad valorem taxation of Marathon's petroleum products does not constitute an impermissible multiple burden on interstate commerce as denounced in *Michigan–Wisconsin Pipe Line Co. v. Calvert. See* 347 U.S. at 170, 74 S.Ct. at 403. The petroleum products in Marathon's tanks awaiting transportation to out-of-state customers have not entered the stream of interstate commerce and are therefore part of the general mass of property in Texas and are subject to state taxation in the usual way. *See Coe*, 116 U.S. at 527, 6 S.Ct. at 478.

Marathon primarily relies upon cases involving the taxation of goods already in interstate commerce in support of its contentions in this appeal. *See Carson Petroleum Co. v. Vial*, 279 U.S. 95, 99, 109, 49 S.Ct. 292, 292, 296, 73 L.Ed. 626 (1929) (striking down tax on oil traveling in interstate commerce that was temporarily delayed in Louisiana); *Hughes Bros. Timber Co.*, 272 U.S. at 475–76, 47 S.Ct. at 172 (striking down tax on logs that had already entered interstate commerce); *Champlain Realty Co.*, 260 U.S. at 373, 43 S.Ct. at 148 (striking down tax on logs traveling out-of-state in river that were stopped for safety reasons at mouth of river); *Eureka Pipe Line Co. v. Hallanan*, 257 U.S. 265, 272, 42 S.Ct. 101, 103, 66 L.Ed. 227 (1921) (striking down tax on oil traveling in interstate commerce that was temporarily delayed in storage tank by pipeline company); *Texas*

*v. Anderson, Clayton & Co.,* 92 F.2d 104, 107 (5th Cir.1937) (striking down tax on cotton that had already entered stream of interstate commerce). These cases are inapplicable because, as we have determined, the petroleum products in Marathon's tanks awaiting transportation to out-of-state customers have not entered the stream of interstate commerce. *See Coe,* 116 U.S. at 525, 6 S.Ct. at 477.

### Conclusion

We hold that the petroleum products in Marathon's tanks awaiting transportation to out-of-state customers have not entered the stream of interstate commerce and are therefore part of the general mass of property in Texas subject to ad valorem taxation.

We affirm the judgment of the trial court.