Opinion issued July 6, 2007
















Opinion
issued July 6, 2007










 

 

 

 




 

 

 













 

     

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-06-00531-CV

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



MARATHON ASHLAND PETROLEUM L.L.C., NOW KNOWN AS,
MARATHON PETROLEUM COMPANY LLC, Appellant

 

V.

 

GALVESTON CENTRAL APPRAISAL DISTRICT, Appellee

 

 



On Appeal from the 10th District Court

Galveston
 County, Texas

Trial Court Cause No. 04CV0841

 








 



O P I N I O N

 

          In
this ad valorem tax case resolved on cross motions for summary judgment,
Marathon Ashland Petroleum L.L.C. (Marathon)[1] appeals
the trial court’s judgment in favor of Galveston Central Appraisal District
(GCAD).  Marathon contends the trial
court erred because GCAD’s taxation of Marathon’s petroleum products awaiting
transportation to out-of-state customers violates the Commerce Clause of the
United States Constitution.  See U.S. Const. art. I, § 8, cl. 3.  We conclude that the
petroleum products GCAD seeks to tax had not entered the stream of interstate
commerce on the date of assessment. 
Thus, the Commerce Clause does not shield these goods from the state
property tax.  We therefore affirm.  

Background

 
        Marathon owns an oil and
gas refinery in Texas City,
and it produces petroleum products for its customers.  Upon completion of the refining process, Marathon segregates petroleum products destined
exclusively for out-of-state customers from its processing units into refinery
tanks it designates to hold solely those products it intends
to later ship out-of-state.  The refined
products remain in the tanks for three to eight days before leaving the
refinery.  

Independent common carriers take the
petroleum products from Marathon’s
tanks, either by barge or through one of two pipelines.  The pipeline carriers require the products to
meet certain regulatory requirements and specifications before they will
transport them.  Marathon
tests the products in its tanks during the three to eight-day interval to
ensure compliance with the regulatory requirements and specifications.  

The pipelines connect to Marathon’s
tanks at a manifold containing two valves. 
Marathon
controls one of the valves and the pipeline carriers control the other
valve.  Marathon must ensure that its valve is
open at the time specified by the pipeline carriers so that the pipeline
carriers can take the products.  When the
pipeline carriers are ready to take the products, they open their valve and the
manifold pumps the products into the pipeline. 

          The
nature of the petroleum refining business dictates that Marathon participate in
a “nomination” process with various pipeline and barge companies to arrange for
the transportation of its products.  The
nomination process requires Marathon
to bid for space with the pipeline carriers. 
Once the pipeline carriers accept a nomination, they set a date for the
transportation of the product.  Marathon often
must nominate its products for transportation before refining begins.  Marathon can
change the final destination of nominated products, but this occurs rarely, and
did not occur in this instance.

          Marathon
elected to have its inventory appraised as of September 1, 2003 for the 2004
tax year.  See Tex. Tax Code Ann.
§ 23.12(f) (Vernon 2001).  GCAD valued Marathon’s
inventory at $41,437,170.  Of this
figure, $13,991,393 represents the value of petroleum products in Marathon’s
tanks then awaiting transportation to out-of-state customers.  After the appraisal review board rejected
Marathon’s tax protest as to its out-of-state products, Marathon sued GCAD, asserting that the
tax violates the Commerce Clause of the United States Constitution.  GCAD and Marathon both moved for summary
judgment.  The trial court granted GCAD’s
summary judgment, denied Marathon’s summary judgment, and concluded that the
products in Marathon’s
tanks had not entered the stream of interstate commerce on September 1, 2003,
and thus are not exempt from local ad valorem taxation.  See
id. § 11.12 (Vernon 2001) (“Property
exempt from ad valorem taxation by federal law is exempt from taxation.”).

Interstate Commerce

          In
its first and second issues, Marathon contends that the trial court erred in
denying its summary judgment and granting summary judgment in favor of GCAD
because the ad valorem taxation of Marathon’s
petroleum products awaiting transportation to out-of-state customers violates
the Commerce Clause of the United States Constitution.  See
U.S. Const. art. I, § 8, cl. 3.  GCAD responds that the Commerce Clause does
not protect Marathon’s
petroleum products from ad valorem taxation because the products awaiting
transportation to out-of-state customers have not entered the stream of
interstate commerce.  

A.  Standard of Review

          We review a trial court’s summary judgment de novo.  Valence Operating Co. v. Dorsett, 164 S.W.3d 656,
661 (Tex. 2005); Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215 (Tex.
2003).  When reviewing a summary
judgment, we take as true all evidence favorable to the nonmovant, and indulge
every reasonable inference and resolve any doubts in the nonmovant’s favor.  Dorsett, 164
S.W.3d at 661; Knott, 128 S.W.3d at 215; Sci. Spectrum,
Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex.
1997).  Under Texas
Rule of Civil Procedure 166a(c), the party moving for summary judgment bears
the burden of showing that no genuine issue of material fact exists and that it
is entitled to judgment as a matter of law. 
Tex. R. Civ. P. 166a(c); Knott,
128 S.W.3d at 215–16.  When both parties
move for summary judgment and the trial court grants one motion and denies the
other, the reviewing court considers the summary judgment evidence presented by
both sides, determines all questions presented, and if the reviewing court
determines that the trial court erred, renders the judgment the trial court
should have rendered.  See Dorsett, 164 S.W.3d at 661;
FM Props. Operating Co. v. City of Austin, 22 S.W.3d 868, 872 (Tex.
2000).

B.  Dormant Commerce Clause

The Commerce Clause of the United States
Constitution expressly grants Congress the power “[t]o regulate Commerce with
foreign Nations, and among the several States, and with the Indian
Tribes.”  U.S. Const. art. I, § 8, cl. 3. 
The United States Supreme Court has held that the Commerce Clause prohibits
certain state regulation of interstate commercial activity.  Okla.
Tax Comm’n v. Jefferson Lines, Inc.,
514 U.S.
175, 179–80, 115 S. Ct. 1331, 1335–36 (1995); Quill Corp. v. North Dakota, 504 U.S. 298, 309, 112 S. Ct. 1904,
1911 (1992).  This implicit principle is known as the “dormant
Commerce Clause.”  Okla. Tax Comm’n, 514 U.S. at 179, 115 S. Ct. at
1335.

The Supreme Court’s decision in Complete Auto
Transit, Inc. v. Brady governs the modern analysis of state taxes on
interstate commerce under the Commerce Clause.  430 U.S. 274, 288, 97 S. Ct. 1076, 1083 (1977); Vinmar, Inc. v. Harris County Appraisal
Dist., 947 S.W.2d 554, 555 (Tex. 1997); Diamond Shamrock Ref.
& Mktg. Co. v. Nueces County Appraisal Dist., 876 S.W.2d 298, 301 (Tex. 1994). 
In Brady, the Court abandoned
the abstract notion that the states cannot tax interstate commerce “itself.”  See D.H. Holmes Co. v. McNamara, 486 U.S. 24, 30, 108 S. Ct. 1619,
1623 (1988); Diamond
Shamrock, 876 S.W.2d at 301.  Rather,
the Court held
that, to be valid, a state tax must: (1) apply to an activity with a
substantial nexus with the taxing state; (2) be fairly apportioned; (3) not
discriminate against interstate commerce; and (4) be fairly related to the
services provided by the state.  Brady, 430 U.S. at 279, 287, 97 S. Ct.
at 1079, 1083; see also Japan Line, Ltd. v. County of Los
Angeles, 441 U.S. 434, 444–45, 99 S. Ct.
1813, 1819 (1979); Diamond
Shamrock, 876 S.W.2d at 301; Harris County Appraisal Dist.
v. Transamerica Container Leasing Inc., 920 S.W.2d 678, 682 (Tex. App.—Houston [1st Dist.] 1995, writ
denied).

Goods that have not yet entered the
stream of interstate commerce, however, are part of the general mass of property
in a state and are subject to state taxation in the usual way.  Coe v.
Town of Errol,
116 U.S.
517, 527, 6 S. Ct.
475, 478 (1886).  Under these
circumstances, the Brady test does
not apply.  See id.; see also Brady, 430 U.S.
at 279, 287, 97 S. Ct.
at 1079, 1083.  In Coe v. Town of Errol, the Supreme Court
held that goods do not enter the stream of interstate commerce “until they have been shipped, or entered with a common carrier
for transportation, to another state, or have been started upon such
transportation in a continuous route or journey.”  116 U.S. at 527, 6 S. Ct. at 478; see also Kosydar
v. Nat’l Cash Register Co., 417 U.S.
62, 66–67, 94 S. Ct. 2108, 2111
(1974) (applying same test in case involving Import-Export Clause).  For goods to be in interstate commerce, “[i]t
must appear that the movement for another state has
actually begun and is going on.”  Hughes
Bros. Timber Co. v. Minnesota,
272 U.S.
469, 475, 47 S. Ct.
170, 172 (1926).  The mere intention to
send goods out-of-state does not place them in interstate commerce, nor does
preparatory gathering for that purpose at a depot or entrepot.  Id.; Coe, 116 U.S.
at 527, 6 S. Ct.
at 478.

The United State Supreme Court has
applied the Coe test in its
construction of the Commerce Clause,[2] the
Import-Export Clause,[3] and the
Export Clause.[4]  See
Kosydar, 417 U.S.
at 66–67, 94 S. Ct. at 2111 (Import-Export Clause); Cornell v. Coyne,
192 U.S.
418, 427–28, 24 S. Ct. 383, 384–85
(1904) (Export Clause); Coe,
116 U.S.
at 527, 6 S. Ct.
at 478 (Commerce Clause).  In each line of cases, the Court has
held that the three clauses do not apply until goods become exports or enter
the stream of interstate commerce under the Coe
test.  See Kosydar, 417 U.S.
at 66–67, 94 S. Ct. at 2111; Cornell, 192 U.S.
at 427–28, 24 S. Ct. at 384–85; Coe,
116 U.S.
at 527, 6 S. Ct. at 478.  Cases
involving all three clauses are therefore instructive in our application of the
Coe test to the facts of this case.  

In Coe, the Court upheld a tax on logs placed on the bank of a river
although it was undisputed that the owner intended to ship the logs out of the
state.  116 U.S. at 527, 6 S. Ct. at
478.  Coe placed some logs on the bank of
Clear Stream in the Town of Errol,
New
 Hampshire.  Id. at
518, 6 S. Ct.
at 475.  Coe had cut the logs the winter
before and intended to float them down the Androscoggin River to Maine.  Id.  The Town of Errol
assessed a tax on the logs.  Id.  Coe sued, challenging the tax under the
Commerce Clause.  Id.
at 520, 6 S. Ct.
at 476.  The Court upheld the tax,
holding that goods intended for exportation do not cease to be part of the
general mass of property in a state, and as such, are subject to taxation in
the usual way.  Id.
at 527, 6 S. Ct.
at 478.  The Court reasoned that Coe
could change his mind with regard to his plans for exportation, and the logs
might never be exported.  Id.
at 526, 6 S. Ct.
at 478.  The Court observed that it would
be “untenable to hold that a crop or a herd is exempt
from taxation merely because it is, by its owner, intended for
exportation.”  Id.
at 527, 6 S. Ct.
at 478.  The Court recognized:

There must be a point of time when [goods]
cease to be governed exclusively by the domestic law, and begin to be governed
and protected by the national law of commercial regulation, and that moment
seems to us to be a legitimate one for this purpose, in which they commence
their final movement for transportation from the state of their origin to that
of their destination.  When the products
of the farm or the forest are collected, and brought in from the surrounding
country to a town or station serving as an entrepot for that particular
region, whether on a river or a line of railroad, such products are not yet
exports; nor are they in process of exportation; nor is exportation begun until
they are committed to the common carrier for transportation out of the state to
the state of their destination, or have started on their ultimate passage to
that state.    

 

Id. at 525, 6 S. Ct. at 477.  The Court held that because the
logs had not begun a “final movement for transportation from the state of their
origin to that of their destination,” the Constitution provided no immunity
from local taxation.  Id.  

          Similarly,
in Kosydar v. National Cash Register Co., the Court upheld a tax on cash registers awaiting
shipment to foreign countries.  417
U.S.
at 69, 94 S. Ct.
at 2112–13.  National Cash Register Co.
(NCR) manufactured cash registers and sold them in foreign
countries.  Id.
at 63, 94 S. Ct.
at 2109–10.  NCR did not maintain an
inventory of registers; it built each register after the customer ordered
it.  Id.
at 63, 94 S. Ct.
at 2110.  After manufacture, NCR
inspected, packed, and crated the registers for shipment abroad.  Id.  NCR then sent the registers to its warehouse
to await shipment.  Id.  The tax commissioner assessed an ad valorem
tax on the registers at the warehouse, and NCR sued, challenging the tax as
violative of the Import-Export Clause.  Id.
at 63–65, 94 S. Ct.
at 2110–11.  Using the test from Coe, the Court upheld the tax on the
ground that the registers at the warehouse were not yet exports.  Id. at
69, 94 S. Ct.
at 2112–13.  At the time the tax was
assessed, the registers were in NCR’s warehouse awaiting shipment.  Id. at
69, 94 S. Ct.
at 2112.  NCR had title and possession of
the registers, and the process of exportation and shipment had not yet
begun.  Id.
at 69, 94 S. Ct.
at 2112–13.  The court disregarded the
fact that NCR designed the registers for use in foreign countries, and there
was almost no possibility they could be sold in the United States.  Id. at 70, 94 S. Ct. at 2113; see
also Empresa Siderurgica v. County of Merced, 337 U.S. 154,
157, 69 S. Ct. 995, 997 (1949) (holding that prospect of export, no matter how
bright, does not start process of exportation).        

          In contrast, in Richfield Oil Corp. v. State Board of Equalization, the Court
struck down a tax on oil that had been loaded onto a ship bound for New Zealand.  329 U.S. 69, 71–72, 86, 67 S. Ct. 156,
158, 165 (1946).  Richfield sold some oil to the New Zealand
government and pumped the oil from a storage tank in California onto a ship bound for New Zealand.  Id. at
71, 67 S. Ct.
at 158.  California assessed a sales tax against
Richfield
measured by the gross receipts from the transaction.  Id. at
71–72, 67 S. Ct.
at 158.  Richfield
challenged the tax as violative of the Import-Export Clause of the Constitution.  Id. at
72, 67 S. Ct.
at 158.  Using the test from Coe, the Court held that the oil on the
ship was in the process of exportation, and that a tax on the oil violated the
Import-Export Clause.  Id.
at 79, 67 S. Ct.
at 161–62.  The Court reasoned that “[t]he certainty that the
goods are headed to sea and that the process of exportation has started may normally be best evidenced by the
fact that they have been delivered to a common carrier for that purpose.”  Id. at
82, 67 S. Ct.
at 163 (footnote omitted).  The Court stated:

The foreign purchaser furnished the ship
to carry the oil abroad.  Delivery was
made into the hold of the vessel from
the vendor’s tanks located at the dock. 
That delivery marked the commencement of the movement of the oil
abroad.  It is true, as the Supreme Court
of California observed, that at the time of the delivery the vessel was in California
waters and was not bound for its destination until it started to move from the
port.  But when the oil was pumped into
the hold of the vessel, it passed into the control of a foreign purchaser and
there was nothing equivocal in the transaction which created even a probability
that the oil would be diverted to domestic use. 
It would not be clearer that the oil had started upon its export journey
had it been delivered to a common carrier at an inland point.  The means of shipment are unimportant so long
as the certainty of the foreign destination is plain.
      

Id. at 82–83, 67 S. Ct. at 163–64.  The Court held that because the oil on the
ship had begun the process of exportation under the Coe test, the Import-Export Clause applied to the transaction and
invalidated the tax.  Id.
at 82–83, 86, 67 S. Ct.
at 163–65.  

          In
Coe and Kosydar, the goods sought to be taxed were intended for exportation
out-of-state, but had not yet been shipped, entered
with a common carrier for transportation to another state, or started upon such
transportation in a continuous route or journey.  See Kosydar, 417 U.S.
at 66–67, 94 S. Ct. at 2111; Coe,
116 U.S.
at 527, 6 S. Ct.
at 478.  Thus, Marathon’s intention to ship its
products out-of-state does not place them into the stream of interstate
commerce.  See Hughes
Bros. Timber Co., 272 U.S. at 475, 47 S. Ct. at 172 (“Mere intention by
the owner ultimately to send the logs out of the state does not put them in
interstate commerce, nor does preparatory gathering for that purpose at a
depot.”); Coe, 116 U.S. at
527, 6 S. Ct. at 478.  

The nomination process also does not place
Marathon’s
products into the stream of interstate commerce.  See
Empresa Siderurgica, 337 U.S. at 157, 69 S. Ct. at 997.
 In Empresa
Siderurgica v. County of Merced, the Court
expressly held that the prospect of export, no matter how bright, does not
start the process of exportation.  Id.;
see also Kosydar, 417 U.S.
at 69–70, 94 S. Ct.
at 2113 (holding that registers specifically designed for foreign countries had
not begun process of exportation when they were waiting in warehouse to be
shipped).  Earmarking products for
transportation on a certain day with a common carrier is not the same as
actually delivering the products to the common carrier for transportation.  Compare
Mich.-Wis.
Pipe Line Co. v. Calvert, 347 U.S. 157, 167–68, 74 S. Ct. 396,
401–02 (1954) (holding that taking of gas into common carrier’s pipeline placed
gas into stream of interstate commerce), and
Richfield Oil Corp., 329 U.S. at
82–83, 67 S. Ct. at 163–64 (holding that oil on ship bound for New Zealand had
begun process of exportation), with Kosydar, 417 U.S. at
69, 94 S. Ct. at 2112–13 (holding that registers waiting in warehouse to be shipped
had not begun process of exportation), and
Coe, 116 U.S. at 527, 6 S. Ct. at 478 (holding that logs on bank of stream
waiting to be transported had not yet entered stream of interstate
commerce).  

Additionally, Marathon has
the power to change the destination of the products in its tanks.  See
Coe, 116 U.S. at 528, 6 S. Ct.
at 479.  While a representative of
Marathon testified that this rarely occurs, and probably would require Marathon to
breach a contract, these factors are not dispositive.  See Kosydar, 417 U.S.
at 69–70, 94 S. Ct. at 2113; Empresa
Siderurgica, 337 U.S.
at 157, 69 S. Ct. at 997; Coe, 116 U.S. at 528, 6 S. Ct. at 479.
   

Unlike the oil pumped
onto the ship in Richfield Oil Corp.,
Marathon
maintains complete control over the products in its tanks.  See
329 U.S.
at 83, 67 S. Ct. at 164. 
Marathon must open a valve to allow the
pipeline carriers to remove the products from the tanks, and the pipeline
carriers will not remove the products until Marathon conducts tests to ensure the
products meet certain regulatory requirements and specifications.  While Marathon does not control when the
pipeline carriers take the products from the tanks, it does control their
ability to take the products.  Control is
an important factor in determining whether the goods have begun the process of
exportation or entered the stream of interstate commerce under the Coe test.  See
Kosydar, 417 U.S.
at 69, 94 S. Ct. at 2112–13; Empresa
Siderurgica, 337 U.S.
at 157, 69 S. Ct. at 997; Richfield Oil
Corp., 329 U.S.
at 83, 67 S. Ct. at 164; Coe, 116 U.S.
at 526, 6 S. Ct. at 478; Va. Indon. Co. v. Harris
County Appraisal Dist., 910 S.W.2d 905,
912–13 (Tex.
1995).

Marathon’s movement of the
products from the processing units to the tanks is similar to the movement of
the logs to the bank of the river in Coe,
or the movement of the registers to the warehouse in Kosydar.  See Kosydar, 417 U.S.
at 63–64, 94 S. Ct. at 2110; Coe, 116
U.S.
at 518, 6 S. Ct.
at 475.  Like the bank of the river in Coe, or the warehouse in Kosydar, Marathon’s tanks serve as a depot where
its products await transportation by the pipeline carriers.  See
Kosydar, 417 U.S.
at 69, 94 S. Ct. at 2112–13; Coe, 116
U.S.
at 525, 6 S. Ct.
at 477.  Gathering goods at a depot or
entrepot in preparation for their journey out-of-state does not place them in
the stream of interstate commerce.  See Hughes Bros. Timber Co., 272 U.S.
at 475, 47 S. Ct. at 172; Coe, 116 U.S. at 527, 6 S. Ct. at 478.  As was stated in Coe, 

The carrying of [goods] in carts or other
vehicles, or even floating them, to the depot where the journey is to commence,
is no part of that journey.  That is all
preliminary work, performed for the purpose of putting the property in a state
of preparation and readiness for transportation.  Until actually launched on its way to another
state, or committed to a common carrier for transportation to such state, its
destination is not fixed and certain.  It
may be sold or other wise disposed of within the state, and never put in course
of transportation out of the state. 
Carrying it from the farm or the forest to the depot is only an interior
movement of the property, entirely within the state, for the purpose, it is
true, but only for the purpose, of putting it into a course of
exportation.  It is no part of the exportation itself.

 

116 U.S. at 528, 6 S. Ct. at 479
(emphasis added).  

We hold that the
petroleum products in Marathon’s tanks awaiting transportation to out-of-state
customers have not entered the stream of interstate commerce because they have
not commenced their movement out of Texas.  See id. at 525, 6
S. Ct.
at 477.  Marathon’s products have not been shipped,
entered with a common carrier for transportation to another state, or started
upon such transportation in a continuous route or journey.  See id. at 525–27, 6 S. Ct. at 477–78; see
also Kosydar, 417
U.S. at 66–67, 94 S. Ct. at 2111; Empresa Siderurgica, 337 U.S.
at 157, 69 S. Ct. at 997; Richfield Oil Corp., 329 U.S. at 82–83, 67
S. Ct. at 163–64; Champlain Realty Co. v. Town of Brattleboro, 260 U.S. 366,
373, 43 S. Ct. 146, 148 (1922); but cf. Va.
Indon. Co., 910 S.W.2d at 912 (holding that goods entered stream of
commerce when they were shipped from vendor to export packer’s facility because
at that point, goods had begun their movement to precommitted foreign
destination).  Marathon’s products are
therefore part of the general mass of property in Texas
and subject to the ad valorem tax assessed by GCAD.  See Coe, 116 U.S.
at 527, 6 S. Ct.
at 478.

Additionally, GCAD’s ad valorem
taxation of Marathon’s
petroleum products does not constitute an impermissible multiple burden on
interstate commerce as denounced in Michigan-Wisconsin
Pipe Line Co. v. Calvert.  See 347 U.S.
at 170, 74 S. Ct.
at 403.  The
petroleum products in Marathon’s tanks awaiting transportation to out-of-state
customers have not entered the stream of interstate commerce and are therefore
part of the general mass of property in Texas and are subject to
state taxation in the usual way.  See Coe,
116 U.S.
at 527, 6 S. Ct.
at 478.  

Marathon primarily relies upon cases involving the taxation of
goods already in interstate commerce in support of its contentions in this
appeal.  See Carson Petroleum Co. v. Vial, 279 U.S. 95,
99, 109, 49 S. Ct. 292, 292, 296 (1929) (striking down tax on oil traveling in
interstate commerce that was temporarily delayed in Louisiana);
Hughes
Bros. Timber Co., 272 U.S. at 475–76, 47 S. Ct. at 172 (striking
down tax on logs that had already entered interstate commerce); Champlain
Realty Co., 260 U.S. at
373, 43 S. Ct. at 148 (striking down
tax on logs traveling out-of-state in river that were stopped for safety
reasons at mouth of river); Eureka Pipe Line Co. v. Hallanan,
257 U.S. 265, 272, 42 S. Ct. 101, 103 (1921) (striking down tax on oil
traveling in interstate commerce that was temporarily delayed in storage tank
by pipeline company); Texas v. Anderson, Clayton & Co.,
92 F.2d 104, 107 (5th Cir. 1937) (striking down tax on cotton that had already
entered stream of interstate commerce). 
These cases are inapplicable because, as we have determined, the
petroleum products in Marathon’s
tanks awaiting transportation to out-of-state customers have not entered the
stream of interstate commerce.  See Coe, 116 U.S.
at 525, 6 S. Ct. at 477.  

Conclusion

          We hold that the petroleum products in Marathon’s tanks
awaiting transportation to out-of-state customers have not entered the stream
of interstate commerce and are therefore part of the general mass of property
in Texas
subject to ad valorem taxation.  We affirm
the judgment of the trial court. 


 

 

                                                                   Jane Bland

                                                                   Justice

 

Panel consists of Justices Hanks,
Bland, and Dorfman.[5]

 











[1] Marathon Ashland Petroleum L.L.C. is now known as
Marathon Petroleum Company LLC.

 

 





[2] U.S. Const. art. I, § 8, cl. 3 (“The
Congress shall have Power . . . [t]o regulate Commerce with foreign Nations,
and among the several States, and with the Indian Tribes . . . .”). 

 





[3] U.S. Const. art. I, § 10, cl. 2 (“No State
shall, without the Consent of the Congress, lay any Imposts or Duties on
Imports or Exports . . . .”). 

 





[4] U.S. Const. art. I, § 9, cl. 5 (“No Tax or
Duty shall be laid on Articles exported from any State.”).

 

 





[5] The Honorable Grant Dorfman, judge of the 129th
District Court of Harris County, participating by assignment.  See Tex. Gov’t Code
Ann. § 74.003(h) (Vernon 2005).